# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

THE NATIONAL ASSOCIATION FOR THE ) 
ADVANCEMENT OF COLORED PEOPLE ) 
ERIE UNIT 2262 and CITIZENS FOR ) 
PENNSYLVANIA'S FUTURE, ) 
                 ) 
Plaintiffs ) 
                 ) 
                 )    CIVIL ACTION NO. ___20-362___
v. ) 
                 ) 
                 ) 
FEDERAL HIGHWAY ADMINISTRATION, ) 
and ) 
PENNSYLVANIA DEPARTMENT OF ) 
TRANSPORTATION, ) 
                 ) 
Defendants. )

---

# COMPLAINT

---

1.     The City of Erie is home to a glistening section of waterfront on Lake Erie that residents, elected officials, and developers are equally anxious to see fully develop into a thriving place for people to live, work, and play. The Bayfront Parkway slices across the waterfront, severing downtown Erie and its residents from the waterfront's amenities. The parkway zooms motorists—many struggling to comply with the 35 mile-per-hour posted speed limit—across Erie, ultimately connecting with the major interstates. The Bayfront Parkway and its speeding motorists serve as a barrier separating residents and visitors in downtown Erie from the diverse and growing waterfront amenities.

2.     As a state road, the Bayfront Parkway and its future lie within the purview of the Pennsylvania Department of Transportation ("PennDOT"). PennDOT has proposed the Bayfront

Parkway Project to address the parkway's current problems and future needs as the waterfront develops.

3.      While PennDOT recognizes the primary need for the project to "improve the pedestrian, bicycle, transit, and passenger vehicle connection of the Erie Central Business District and adjacent neighborhoods to the waterfront property north of the Bayfront Parkway," Pa. Dep't Transp., *Categorical Exclusion Evaluation for the Central Bayfront Project* 7 (2020), https://bayfrontparkwayproject.com/wp-content/uploads/2020/06/2020-06-15-Approved-Level-2-CE.pdf ("Cat. Ex."), PennDOT selected a design for the Bayfront Parkway that prioritizes vehicles over pedestrians and cyclists. The Bayfront Parkway Project ignores real accessibility problems facing pedestrians and cyclists today because the parkway acts as a barrier between downtown and the Bayfront and instead tries to address car congestion issues that may occur in the future. PennDOT also ignored potential impacts to water quality, flooding, aesthetics, climate change, and the communities living closest to the Bayfront Parkway.

4.      PennDOT selected the vehicles-first project design in a flawed and illegal environmental review process that bypassed mandatory public hearings. Even worse, PennDOT had initially told interested members of the public that it would be completing an environmental assessment, which would have formally analyzed various alternative designs, weighed how those alternatives met the project's purpose, and solicited formal public comments on the designs prior to making a final selection. Instead, PennDOT used a shortcut environmental review process—a categorical exclusion—for which this major project does not qualify. When members of the public pleaded for PennDOT to complete an environmental assessment, PennDOT responded that the Federal Highway Administration prohibits PennDOT from completing an environmental assessment for the Bayfront Parkway Project.

2

5.     This project will dictate for decades to come whether the Bayfront Parkway will be an even-more formidable barrier for pedestrians and cyclists seeking to access the Erie Bayfront from downtown Erie or whether the Bayfront Parkway will be designed in a way to integrate multi-modal transportation in a burgeoning, world-class waterfront.

6.     The NAACP and PennFuture bring this lawsuit to force PennDOT to follow the rules: complete an environmental assessment that fully analyzes alternatives to the Bayfront Parkway Project and then hold a public hearing soliciting public feedback on those alternatives before selecting a final design.

7.     This lawsuit challenges the Federal Highway Administration's approval of a categorical exclusion for the Bayfront Parkway Project.

8.     The Federal Highway Administration's approval of the categorical exclusion for the Bayfront Parkway Project was arbitrary and capricious and violated the Administrative Procedure Act, the National Environmental Policy Act, the Federal Aid Highway Act, and implementing regulations. PennDOT's failure to examine potentially significant direct, indirect, and cumulative impacts of the project renders the Federal Highway Administration's approval of a categorical exclusion for the project arbitrary and capricious.

9.     Additionally, PennDOT's failure to hold a public hearing regarding the Bayfront Parkway Project violates the Federal Aid Highway Act.

## JURISDICTION AND VENUE

10.     This action arises under the National Environmental Policy Act, 42 U.S.C. §§ 4321 et seq., the Federal Aid Highway Aid Act, 23 U.S.C. §§ 101 et seq. and the Administrative Procedure Act, 5 U.S.C. §§ 701 et seq. The Court has jurisdiction over this action pursuant to the Administrative Procedure Act, 5 U.S.C. §§ 701 et seq. and 28 U.S.C. § 1331 (federal question).

11.     The Court has the authority to issue the requested declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201–2202 and 5 U.S.C. §§ 705–706. Injunctive relief is authorized by Rule 65 of the Federal Rules of Civil Procedure.

12.     The requested relief would redress the actual, concrete injuries to Plaintiffs caused by the Federal Highway Administration's failure to comply with duties mandated by the Administrative Procedure Act, the Federal Aid Highway Act, the National Environmental Policy Act and their implementing regulations.

13.     The challenged agency actions are final and subject to judicial review pursuant to 5 U.S.C. §§ 702, 704, and 706.

14.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because the Erie Bayfront Parkway is located in the City of Erie, Pennsylvania located in Erie County, Pennsylvania.

## PARTIES

15.     Plaintiffs are non-profit organizations whose members live, work, and recreate in and around Erie's Bayfront and downtown areas nearby the Bayfront Parkway where PennDOT plans to construct the Bayfront Parkway Project. Plaintiffs' members' interests are threatened by the Bayfront Parkway Project, because the proposed design will increase vehicle traffic volumes on the parkway, which will adversely impact the natural, residential, and recreational resources adjacent to the parkway that members use and will restrict members' ability to access the Bayfront's resources and amenities.

16.     Plaintiff, Citizens for Pennsylvania's Future ("PennFuture") is a state-wide non-profit membership organization based in Harrisburg, Pennsylvania and founded in 1998. PennFuture's mission is to advocate for the protection of Pennsylvanians' air, water, and land and to empower

Pennsylvanians to build sustainable communities for future generations by using legal, policy, outreach, communications, and civic engagement tools.

17.     PennFuture has several office locations within Pennsylvania, including Erie. PennFuture's Erie office primarily focuses on protecting and improving water resources in the Erie region. PennFuture has members who live and recreate in Erie and use the Bayfront Parkway and its intersecting roads, including Holland Street, Sassafras Street, and State Street, to travel around Erie and to the Bayfront. Members frequently walk or use a bicycle to travel across the Bayfront Parkway to visit Erie's Bayfront and Downtown. PennFuture's members visit the Blasco Library and Erie Maritime Museum located on the Bayfront side of the Bayfront Parkway. PennFuture's members jog or stroll along the parkway to enter the Bayfront and use the Bayfront Boardwalk, Lake Erie, and Presque Isle Bay and its park for a variety of pier and water-based recreational activities including sight-seeing, exercising, socializing, swimming, bird-watching, kayaking, and fishing.

18.     John Vanco is a member of PennFuture who has lived in Erie, Pennsylvania since 1968. Mr. Vanco and his wife regularly walk or jog on the Bayfront and use the parkway intersections to get there. Mr. Vanco enjoys visiting the Blasco Library, the Erie Maritime Museum, and regularly invites out-of-town guests to join him on Erie's Bayfront to visit the Museum and enjoy pier activities. Mr. Vanco is concerned that the new Bayfront Parkway design does not provide pedestrian friendly infrastructure and that even the pedestrian bridges proposed are still just tentative proposals and are not funded. Mr. Vanco does not believe he, his wife, or his guests can safely enjoy the Bayfront if vehicle traffic increases without a balanced expansion of pedestrian transportation facilities. Mr. Vanco is also concerned that the increased traffic volumes on the Parkway will contribute to adverse impacts to Erie's water resources including

Lake Erie and Presque Isle Bay. Mr. Vanco will be less likely to frequent the Bayfront due to these concerns.

19. The Bayfront Parkway Project's reconfiguration of the existing roadways and the mounting vehicle traffic volumes that its new design will yield threaten the quality of the natural water resources that PennFuture's members enjoy and impairs their ability to take advantage of these resources. The proposed Bayfront Parkway design diminishes Erie's water quality and severely impinges on PennFuture's members' ability to safely and easily travel to the Bayfront via the parkway to enjoy the Bayfront's amenities.

20. PennFuture's members would like to participate in a public hearing so that they can give input on the Project's final design and its impact on them and the water resources they use.

21. Plaintiff, the National Association for the Advancement of Colored People ("NAACP"), Erie Unit 2262 ("NAACP Erie Chapter"), is a nonprofit membership organization. It is part of the state and national network for the largest civil rights organization in the nation, with more than 2.2 million members and chapters in every state. The NAACP was founded in 1909 in response to ongoing violence against Black communities and from its inception has fought for equal protection under the law for Black communities.

22. The NAACP Erie Chapter uses the law and policy to combat structural inequalities and oppressive policies used to subordinate and deny Black people equal rights, including the right to a healthy and enjoyable environment and safe and accessible transportation. Implicit in this is the right to breathe fresh air and swim and fish in clean water; the right to enjoy one's home without noxious odors and grating traffic interference; the right to freely access public benefits and amenities like the Bayfront; the right to access and protect social, cultural, and historical benefits and resources like Dickson Tavern, a former safe haven on the underground railroad; the right to

live in a cohesive neighborhood integrated with the broader Erie community; the equal right to transportation infrastructure irrespective of socio-economic and physical constraints; and the right to culturally-responsive public outreach that promotes meaningful participation in decision-making processes that impact the NAACP Erie Chapter's members' environment.

23.     The NAACP Erie Chapter was founded in 1918 and has members who live in the East and West Bayfront Neighborhoods next to the Parkway. Gary Horton leads the NAACP Erie Chapter. Some of NAACP's members live near the parkway in areas designated as "environmental justice" communities according to EPA's criteria because of the disproportionate amount of low-income people who live there. The East Bayfront Neighborhood has a disproportionate rate of pedestrian crashes when compared to Erie as a whole. The area where the West Bayfront Neighborhood is located is a historically significant cultural site, New Jerusalem, a colony settled in the early 1800s by free Black people who escaped enslavement. Because the Bayfront Parkway stands in the backyards of the NAACP Erie Chapter's members, increased volumes of traffic and pollution generated because of the project will impair the NAACP Erie Chapter's members' ability to safely and fully enjoy their properties and neighborhoods.

24.     The NAACP Erie Chapter has members who use pedestrian and bicyclist modes of transportation to travel to the Bayfront across the parkway. NAACP Erie Chapter members use the Bayfront Parkway to access the Bayfront for recreation, education, and social engagements. The Bayfront Project's reconfiguration of the existing roadway system and the mounting vehicle traffic volumes induced by its design will make it more difficult for the NAACP Erie Chapter's members who use pedestrian and bicycle transport modes to access the Bayfront to enjoy its amenities and natural resources. In denying NAACP Erie Chapter's members these benefits,

7

members will lose out on educational, health, and social opportunities that connect them with their fellow Erie residents.

25.     Members, including those who live adjacent to the Bayfront, do not believe PennDOT's outreach has been culturally responsive and, as a result, members have not been given adequate opportunities to provide meaningful input to PennDOT on the parkway's design, nor have they been given the option to participate in a public hearing.

26.     The aesthetic, recreational, social, educational, and procedural interests of Plaintiffs and their members have been adversely affected and irreparably injured by the process by which PennDOT applied for and the Federal Highway Administration approved a categorical exclusion for the Bayfront Parkway Project.  They will also be injured by the project itself. The adverse impacts that will result from the Federal Highway Administration's and PennDOT's illegal process and flawed decision will cause actual, imminent, concrete, and particularized harm to the interests of Plaintiffs and their members. PennFuture and NAACP Erie Chapter are also harmed by PennDOT's refusal to hold a public hearing to allow their members to provide input on the project despite members repeated requests for a hearing.

27.     Defendant, the Federal Highway Administration, is a federal agency within the United States Department of Transportation with its principal place of business at 1200 New Jersey Avenue SE, Washington, DC. The U.S. Secretary of Transportation has delegated to the Federal Highway Administration the authority to carry out the functions of the Secretary of Transportation under NEPA as they relate to matters within Federal Highway Administration's primary responsibilities. 49 C.F.R. §1.81(a)(5). The Federal Highway Administration's distribution and spending of federal funds under the Federal-Aid Highway Program and approval of actions pursuant to Title 23 of the U.S. Code are major federal actions subject to NEPA.

28.     The Federal Highway Administration and PennDOT have entered into an agreement establishing administrative procedures for using a categorical exclusion. *See* "Programmatic Agreement Between the Federal Highway Administration, Pennsylvania Division and the Pennsylvania Department of Transportation Regarding the Processing of Actions Classified as Categorical Exclusions for Federal-Aid Highway Projects," July 22, 2019, https://www.penndot.gov/ProjectAndPrograms/RoadDesignEnvironment/Environment/environm ental-policy/Documents/CE%20Programmatic%20Agreement%202019.pdf. This agreement requires PennDOT to submit documentation to the Federal Highway Administration any time it seeks a categorical exclusion that, under the Federal Highway Administration regulations, requires documentation. *See* 23 C.F.R. § 771.117(d). PennDOT must demonstrate in its documentation that its project will not result in significant environmental impacts, that the action qualifies for a categorical exclusion, and the action does not involve unusual circumstances that warrant the preparation of an environmental assessment or an environmental impact statement. The Federal Highway Administration must review the documentation before determining whether to approve the categorical exclusion.

29.     Defendant, the Pennsylvania Department of Transportation, is an agency and instrumentality of the Commonwealth of Pennsylvania created in 1970, with its principal place of business at 400 North Street, Harrisburg, Pennsylvania. It oversees programs and policies affecting highways, urban and rural public transportation, state and local bridges, airports, railroads, ports, and waterways. PennDOT undertakes transportation projects using federal funding received under the Federal-Aid Highway Program and must assist Federal Highway Administration in fulfilling its obligations under NEPA for PennDOT projects that receive federal-aid. 23 C.F.R. § 771.109.

30.     PennDOT assumed responsibility for compliance with NEPA to the extent that PennDOT was responsible for conducting the environmental review, preparing the categorical exclusion documentation and certification, and submitting this document to the Federal Highway Administration for final approval. 23 U.S.C. § 326(e).

31.     The relief sought by Plaintiffs would remedy the injuries suffered by Plaintiffs and their members.

## STATUTORY AND REGULATORY BACKGROUND

### The National Environmental Policy Act

32.     The National Environmental Policy Act ("NEPA") declares "a national policy which will encourage productive and enjoyable harmony between" people and their environment and "promote efforts which will prevent or eliminate damage to the environment" while promoting the health and welfare of our communities. 42 U.S.C. § 4321.

33.     NEPA applies to "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C).

### NEPA's Regulatory Structure

34.     The White House Council on Environmental Quality promulgates general regulations implementing NEPA that are binding on all federal agencies. *See* 40 C.F.R. § 1500.3.

35.     Each federal agency, including the Federal Highway Administration, then promulgates its own regulations, consistent with the Council on Environmental Quality regulations, implementing NEPA for its agency. 40 C.F.R. § 1507.3(b).

36.     The Council on Environmental Quality most recently modified its NEPA regulations, effective September 14, 2020. Update to the Regulations Implementing the Procedural Provisions of the National Environmental Policy Act, 85 Fed. Reg. 43,304 (July 16, 2020).

10

37.    The final agency action in this case occurred on June 15, 2020, prior to the effective date

of the new Council on Environmental Quality regulations. The prior version of the Council on

Environmental Quality regulations, in effect at the time of the final agency action, govern this

case.[1]

38.    The Federal Highway Administration most recently modified its NEPA regulations on

October 29, 2018, effective November 28, 2018.  Environmental Impacts and Related

Procedures, 82 Fed. Reg. 54,480 (Oct. 29, 2018). The current Federal Highway Administration

NEPA regulations do not reflect changes to the Council on Environmental Quality NEPA

regulations effective September 14, 2020.

### Council on Environmental Quality NEPA Regulations

39.    NEPA is a "procedural statute intended to ensure Federal agencies consider the

environmental impacts of their actions in the decision-making process." 40 C.F.R. § 1500.1(a).

40.    Federal agencies fulfill their NEPA obligations in one of three ways: by preparing an

environmental impact statement, by preparing an environmental assessment and Finding of No

Significant Impact, or by determining the project is subject to a categorical exclusion. 40 C.F.R.

§§ 1501.3, 1501.4, and 1508.4.

41.    An agency must prepare an environmental impact statement for all "major Federal

actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C); *see

also* 40 C.F.R. § 1501.4; 23 C.F.R. § 771.123(a). The environmental impact statement must

include a "full and fair discussion of significant environmental impacts" of the proposed action,

as well as "reasonable alternatives that would avoid or minimize adverse impacts or enhance the

---

[1] For the Court's convenience, we will cite to the Council on Environmental Quality regulations
that applied on June 15, 2020 and the current regulations.

quality of the human environment." 40 C.F.R. §§ 1502.1. An environmental impact statement must be published for public review and comment. 40 C.F.R. § 1503.1(a)(1)(v).

42.     An environmental assessment requires the agency to "briefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact." 40 C.F.R. § 1508.9(a) (as effective on June 15, 2020); *see also* 40 C.F.R. § 1501.5(c)(1).

43.     A categorical exclusion is "a category of actions which do not individually or cumulatively have a significant effect on the human environment and which" a Federal agency has adopted regulations finding that the category of actions has "no such effect." 40 C.F.R. § 1508.4 (as effective on June 15, 2020); *see* also 40 C.F.R. § 1501.4.

44.     Where a project falls within a categorical exclusion, neither an environmental impact statement nor an environmental assessment is required. 40 C.F.R. § 1508.4 (as effective on June 15, 2020); *see also* 40 C.F.R. § 1501.4.

### Federal Highway Administration's NEPA Regulations

45.     Any state or local governmental entity receiving federal highway funding must comply with NEPA. 23 C.F.R. § 771.109(c)(2).

46.     For purposes of NEPA review, Federal Highway Administration projects must "have independent utility or …significance; …and not restrict consideration of alternatives for other reasonably foreseeable transportation improvements." 23 C.F.R. § 771.111.

47.     The Federal Highway Administration has promulgated detailed regulations regarding categorical exclusions. *See* 23 C.F.R. § 771.117. The Federal Highway Administration defines categorical exclusions as actions that meet the Council on Environmental Quality definition of

categorical exclusion "and, based on [the Administration's] past experience with similar actions, do not involve significant environmental impacts." 23 C.F.R. § 771.117(a).

48.     The Federal Highway Administration's regulations preclude the use of a categorical exclusion when the proposed action "induce[s] significant impacts to planned growth… for the area" or has "significant impacts on travel patterns." 23 C.F.R. §771.117(a).

49.     Where an action would otherwise be classified as a categorical exclusion involves "unusual circumstances," the Federal Highway Administration is required "to conduct appropriate environmental studies to determine" if the categorical exclusion classification is proper. 23 C.F.R. § 771.117(b). The regulations list four "unusual circumstances," including "substantial controversy on environmental grounds." 23 C.F.R. § 771.117(b)(2).

50.     The Federal Highway Administration's categorical exclusion regulation divides actions into two categories: those listed in 23 C.F.R. § 771.117(c) that "normally do not require any further NEPA approvals" by the Federal Highway Administration and those listed in 23 C.F.R. § 771.117(d), that only may be designated as categorical exclusions "after Administration approval" based on submitted "documentation that demonstrates that the specific conditions or criteria for these [categorical exclusions] are satisfied, and that significant environmental effects will not result."

## The Federal Aid Highway Act

25.     The Federal Aid Highway Act outlines a state agency's general responsibilities for projects that receive aid from the Federal Highway Administration. 23 U.S.C. §§ 101 et seq.

26.     The Federal Aid Highway Act mandates that a state transportation department "shall certify to the Secretary [of the Department of Transportation] that it has had public hearings, … and has considered the economic and social effects of such a location, its impact on the

13

environment, and its consistency with the goals and objectives of …[the community's] urban planning…" whenever a state agency "submits plans for a Federal-aid highway project… going through[] any city, town, or village." 23 U.S.C. § 128(a).

27.     The state agency's certification "shall be accompanied by a report which indicates the consideration given to the economic, social, environmental, and other effects of the plan or highway location or design and various alternatives which were raised during the hearing or which were otherwise considered." 23 U.S.C. § 128(a).

28.     The state agency must submit a transcript of the hearing to the Federal Highway Administration. 23 U.S.C. § 128(b).

29.     Federal Highway Administration regulations clarify that "[e]ach State must have procedures approved by the [Administration] to carry out a public involvement/public hearing program pursuant to 23 U.S.C. §§ 128 and 139 and CEQ regulations." 23 C.F.R. § 771.111(h)(1).

30.     The regulations further specify that state public hearing procedures must provide for "[o]ne or more public hearings or the opportunity for hearing(s) to be held by the State highway agency… for any Federal-aid project that … substantially changes the layout or functions of connecting roadways." 23 C.F.R. § 771.111(h)(2)(iii).

31.     A state agency must provide "[r]easonable notice to the public of either a public hearing or the opportunity for a public hearing." 23 C.F.R. § 771.111(h)(2)(iv). The public hearing should also include information about "[t]he State highway agency's procedures for receiving both oral and written statements from the public." 23 C.F.R. § 771.111(h)(2)(v)(E).

32.     After each public hearing, the state highway agency must submit a transcript to the Federal Highway Administration, along with a certification that "a required hearing or hearing

14

opportunity was offered." 23 C.F.R. § 771.111(h)(vi). The state agency must also include "copies of all written statements from the public, both submitted at the public hearing or during an announced period after the public hearing." 23 C.F.R. § 771.111(h)(vi).

### Executive Order 12,898: Environmental Justice

33.     Executive Order 12,898 mandates that "each Federal agency shall make achieving environmental justice part of its mission by identifying and addressing, as appropriate, disproportionately high and adverse human health or environmental effects of its programs, policies, and activities on minority populations and low-income populations in the United States." Exec. Order No. 12,898, 59 Fed. Reg. 7,629, 7,629 (Feb. 11, 1994).

34.     Both the U.S. Department of Transportation and the Federal Highway Administration have adopted orders to comply with this mandate in the context of NEPA. Dep't of Transp. Order 5610.2(a)(4)(a); Fed. Highway Admin. Order 6640.23A.

35.     Under the Department of Transportation's order, the Department commits to "fully considering environmental justice principles throughout planning and decision-making processes." Dep't of Transp. Order 5610.2(a)(4)(a).

36.     To "assure… nondiscrimination" and to "prevent[] disproportionately high and adverse effects," the Department of Transportation commits to comply with NEPA in a way to "identify, early in the development of the… activity, the risk of discrimination and disproportionately high and adverse effects so that positive corrective action can be taken." Dep't of Transp. Order 5610.2(a)(7)(b).

37.     Under the Order, the Department of Transportation commits to "identifying and evaluating environmental, public health, and interrelated social and economic effects of DOT…activities;" to "proposing measures to avoid, minimize and/or mitigate disproportionately

high and adverse environmental and public health effects and interrelated social and economic effects, and providing offsetting benefits and opportunities to enhance communities, neighborhoods, and individuals affected by DOT…activities;" and to "considering alternatives" that "would result in avoiding and/or minimizing disproportionately high and adverse human health or environmental impacts." Dep't of Trans. Order 5610.2(a)(7)(c).

38.     The Federal Highway Administration implements Executive Order 12,898 through Order 6640.23A(6)(b), which defines "adverse effects" as "the totality of significant individual or cumulative human health or environmental effects, including interrelated social and economic effects." These include "bodily impairment, … illness, or death; air, noise, and water pollution and soil contamination;" "destruction or disruption of community cohesion or a community's economic vitality; destruction or disruption of the availability of public and private facilities and services;" and "isolation,…exclusion or separation of minority or low-income individuals within a given community or from the broader community." Fed. Highway Admin. Order 6640.23A(5)(f).

### Executive Order 11,990: Wetlands

39.     Executive Order 11,990 requires each federal agency to "take action to minimize the destruction, loss or degradation of wetlands, and to preserve and enhance the natural and beneficial values of wetlands in carrying out the agency's responsibilities." Exec. Order No. 11,990, 42 Fed. Reg. 26,961, 26,961 (May 24, 1977).

40.     Executive Order 11,990 directs that agencies "shall avoid undertaking or providing assistance for new construction located in wetlands" unless the agency finds that "there is no practicable alternative to such construction" and that "the proposed action includes all

practicable measures to minimize harm to wetlands which may result from such use." Exec.
Order No. 11,990.

## The Administrative Procedure Act

41.     The Administrative Procedure Act ("APA") governs judicial review of an agency's
compliance with NEPA.

42.     Under the APA, a reviewing court shall "hold unlawful and set aside agency action,
findings, and conclusions found to be... arbitrary, capricious, an abuse of discretion, or
otherwise not in accordance with law," "in excess of statutory jurisdiction [or] authority," or
"without observance of procedure required by law." 5 U.S.C. § 706(2).

43.     The APA authorizes the award of declaratory and injunctive relief. 5 U.S.C. § 703.

## FACTUAL AND PROCEDURAL BACKGROUND

### The Bayfront Parkway

44.     The Bayfront Parkway (State Road 4034) is a state highway running east to west at the
northern edge of the City of Erie, dividing the city and its residents from the Lake Erie Bayfront
and its amenities.

45.     The Bayfront is home to several key amenities, including the public library, the
Greyhound bus terminal, a miniature golf course, the Erie Maritime Museum, a pier, two hotels,
a convention center, several marinas, and pedestrian/cyclist pathways.

46.     The two-mile segment of the Bayfront Parkway between Holland Street and Sassafras
Street "is a two lane limited access road with a speed limit of 35 MPH that most drivers have
difficulty adhering to – resulting in pedestrian conflicts throughout the Bayfront area." Erie-
Western Pa. Port Auth., *Master Development and Facilities Plan* 17 (Apr. 2018) ("Erie Port
Master Plan"). The intersection between Holland Street and Bayfront Parkway features two at-

grade pedestrian crossings marked by crosswalks and pedestrian crossing signals, one on the north side of Bayfront Parkway across Holland Street and one on the east side of Holland Street across Bayfront Parkway. There is no sidewalk along Bayfront Parkway between Holland Street and State Street. The intersection between State Street and Bayfront Parkway features four at-grade pedestrian crossings marked by crosswalks and pedestrian crossing signals. There is no sidewalk along Bayfront Parkway between State Street and Sassafras Street. The intersection between Sassafras Street and Bayfront Parkway features one at-grade pedestrian crossing marked by a crosswalk on the north side of Bayfront Parkway across Sassafras Street.

47.    A pedestrian and bicycle pathway runs along the Bayfront parallel to the Bayfront Parkway, but the "large volume and speed of vehicular traffic" on the Bayfront Parkway makes walking or riding on the bike path an unpleasant, or even dangerous, experience. Erie Port Master Plan at 11.

48.    Bayfront Parkway's southern edge flanks neighborhoods with high concentrations of impoverished residents and communities of color. Low-income neighborhoods face higher safety risks due to the disproportionate rate of pedestrian crash incidents in these areas. *See* Erie Metro. Transp. Org., *2021-2024 Transportation Improvement Program: Environmental Justice – Analysis of Benefits and Burdens*, https://eriecountypa.gov/wp-content/uploads/2020/05/2021-Environmental-Justice-Core-Elements-Documentation.pdf ("Transportation EJ Analysis").

49.    Erie residents complain that the Bayfront Parkway "acts as a barrier" to the Bayfront "preventing safe and efficient access to the [Bayfront]", especially for pedestrians and cyclists. McCormick Taylor, *Bayfront Parkway Feasibility Study* 1 (2017) ("Bayfront Parkway Feasibility Study"). These safety concerns arise out of the "heavy vehicular use of the Bayfront Parkway and the lack of well-designed cross-walks." Bayfront Parkway Feasibility Study at 29.

## The Bayfront Parkway Project

50.     PennDOT is proposing the "Bayfront Parkway Project" on the portion of the Bayfront Parkway in the heart of Erie, between Holland Street and Sassafras Street, adjacent to many Bayfront amenities.

51.     The Bayfront Parkway Project is a massive construction project that will overhaul three major intersections where city streets intersect the parkway, substantially changing the layout of the connecting roadways, and costing between $70 million and $100 million.

52.     State projects that receive federal aid from the Federal Highway Administration must comply with NEPA.

53.     The Federal Highway Administration approved PennDOT's application for federal funding and will provide PennDOT with $21 million dollars in federal aid in the form of a BUILD grant for the project.

54.     The Bayfront Parkway Project proposes to convert two intersections—Holland Street and Sassafras Street—into dual-lane roundabouts, removing all traffic signals and pedestrian signals. Cat. Ex. at 5–6.

55.     The Bayfront Parkway Project will also overhaul the State Street intersection by sinking a portion of the parkway below State Street. Cat. Ex. at 54. PennDOT plans to build two ramps from the parkway up to State Street. *Id.* With a single lane in each direction leading from the parkway to State Street, pedestrians crossing State Street will be in conflict with turning traffic from the parkway onto State Street. To create the underpass for the parkway to run below State Street, PennDOT will need to remove railroad tracks owned by CSX, which it plans to relocate to an area further east by the Soldiers' and Sailors' Home. Cat. Ex. at 54.

19

56.     While PennDOT has a clear plan for reconfiguring the vehicular traffic at these three intersections between city streets and the Bayfront Parkway, PennDOT's plan for cyclist and pedestrian access, including visually-impaired pedestrians, to navigate across the intersection is less clear.

57.     PennDOT's documentation about the project contains conflicting information about pedestrian and cyclist access at the intersection between Bayfront Parkway and Sassafras Street. The "Project Description" in the Categorical Exclusion Evaluation states that intersection between Bayfront Parkway and Sassafras Street will include "sidewalks, crosswalks and an elevated pedestrian bridge… across the Bayfront Parkway" Cat. Ex. at 6, 11; but the "Bayfront Parkway Sequence of Construction" in the Categorical Exclusion Evaluation does not indicate a pedestrian bridge across Bayfront Parkway at Sassafras Street. Cat. Ex. at 44–45. Likewise, PennDOT's BUILD grant application, submitted on or about May 14, 2020, indicates a different plan for Sassafras Street—an "at-grade pedestrian crossing… across Sassafras Street Extension…" with no pedestrian bridge across Bayfront Parkway. Pa. Dep't Transp., *Connecting Erie's Waterfront: Bayfront Parkway Mobility and Freight Improvement Program* 4 (2020), https://www.penndot.gov/RegionalOffices/district-- 1/PublicMeetings/ErieCounty/Documents/Report-PennDOT-ErieBUILDGrant-20200514- FINAL.pdf ("BUILD Grant Application").

58.     PennDOT's Categorical Exclusion Evaluation proposes that the intersection between Bayfront Parkway and Holland Street will include "sidewalks, crosswalks and an elevated pedestrian bridge" across Bayfront Parkway. Cat. Ex. at 6, 13. Drawings included with the Categorical Exclusion Evaluation indicate a pedestrian bridge on the east side of Holland Street across Bayfront Parkway. Cat. Ex. at 13. PennDOT's BUILD grant application clarifies that "an

elevated pedestrian bridge will be added to connect the… [UPMC] Hamot Hospital's campus and Downtown Erie to the Waterfront District." BUILD Grant Application at 4. The UPMC Hamot Campus is located on the west side of Holland Street.

59.    PennDOT documentation about the project contains conflicting information about pedestrian and cyclist access at the intersection between Bayfront Parkway and State Street. The "Project Description" in the Categorical Exclusion Evaluation states that "[t]he Bayfront Parkway at State Street intersection" will feature "[n]ew sidewalks, crosswalks and an elevated pedestrian bridge [to] be added across the Bayfront Parkway" Cat. Ex. at 6; but the "Bayfront Parkway Sequence of Construction" in the Categorical Exclusion Evaluation does not indicate a pedestrian bridge across Bayfront Parkway at State Street. Cat. Ex. at 44–45. PennDOT's BUILD grant application likewise indicates the State Street intersection will feature "[n]ew sidewalks and crosswalks" but no pedestrian bridge across Bayfront Parkway. BUILD Grant Application at 4.

60.    While the Categorical Exclusion Evaluation includes a description of the structure for State Street of the Bayfront Parkway, Cat. Ex. at 57, and a bridge over the CSX Railroad tracks at the Soldiers' and Sailors' Home, Cat. Ex. at 67, PennDOT did not include any evaluation of pedestrian bridges across Bayfront Parkway in its Categorical Exclusion Evaluation.

### The NEPA Process and Approval

61.    The Bayfront Parkway Project is a major federal action subject to NEPA.

62.    On February 22, 2018, agency officials from PennDOT began the NEPA scoping process to determine the review necessary for the Bayfront Parkway Project by convening a "Scoping Field View" meeting. Cat. Ex. at 15.

63.     During the February 22, 2018 "Scoping Field View" meeting, "it was determined that the project should proceed as an E[nvironmental] A[ssessment] due to the alternatives yet under consideration and the unknown extent of potential impacts." Cat. Ex. at 40.

64.     The decision to proceed with an environmental assessment was based, in part, on the "complexity of design alternatives and heavy public involvement." Cat. Ex. at 17.

65.     According to an April 15, 2020 letter from the Federal Highway Administration to PennDOT, the Federal Highway Administration "formally concurred on the project scope and [the] level of NEPA documentation"—an environmental assessment—"on February 27, 2020." Cat. Ex. at 40.

66.     On March 31, 2020, PennDOT requested that the Federal Highway Administration reclassify or "downscope" the Bayfront Parkway Project from an environmental assessment to a categorical exclusion. Cat. Ex. at 40.

67.     On April 15, 2020, the Federal Highway Administration approved PennDOT's request to "downscope" the Bayfront Parkway Project from an environmental assessment to a categorical exclusion. Cat. Ex. at 40.

68.     In its April 15, 2020 correspondence with PennDOT, the Federal Highway Administration concluded "that the project, as proposed, would not result in either individual or cumulative significant impacts." Cat. Ex. at 40–41.

69.     At the time the Federal Highway Administration approved the use of a categorical exclusion for the Bayfront Parkway Project based on its conclusion that "the project, as proposed, would not result in either individual or cumulative significant impacts," Cat. Ex. at 40–41, PennDOT had not submitted to the Federal Highway Administration documentation evaluating the Bayfront Parkway's Project's impacts.

70.     On April 29, 2020, PennDOT informed the public of this environmental review change in a press release, in which it also announced it had selected a design for the Bayfront Parkway Project. *See* Press Release, Pa. Dep't Transp., PennDOT Announces Preferred Alternatives for the Bayfront Parkway Central Corridor Improvement Project, Erie County (April 29, 2020) ("Press Release").

71.     The April 29, 2020 press release also relayed that the Federal Highway Administration "found the project, as proposed, will not either individually or cumulatively have any significant or adverse environmental impacts" and has provided approval for the project to be treated as a categorical exclusion. *See* Press Release.

72.     Once PennFuture was alerted to PennDOT's request to seek a categorical exclusion for the Bayfront Parkway Project, the organization sprang into action and sent a letter on June 4, 2020 sharing its significant concerns about the project and formally asking PennDOT to complete an environmental assessment. Letter from Sarah Bennett, Clean Water Advocacy Campaign Manager, PennFuture, to Mark Nicholson, Pa. Dep't of Transp. (June 4, 2020).

73.     Likewise, the Erie Bayfront Coalition, a broad-based membership organization composed of Erie residents, local politicians, and community-based organizations focusing on urban planning, the environment, and transportation, sent a letter to elected officials in Erie on June 10, 2020 sharing significant concerns about the Bayfront Parkway Project and asking Erie City Council to ask PennDOT to complete an environmental assessment. Letter from Erie Bayfront Coalition to elected leaders of Erie, PA (June 10, 2020).

74.     On June 9, 2020, PennDOT submitted its Categorical Exclusion Evaluation package to the Federal Highway Administration. Cat. Ex. at 3.

75.     The Categorical Exclusion Evaluation failed to analyze potentially significant impacts of the Bayfront Parkway Project, including impacts: (a) to water quality in Mill Creek and Presque Isle Bay; (b) from increased Lake Erie flooding; (c) from hazardous waste; (d) to environmental justice communities; (e) related to greenhouse gas emissions and climate change; (f) from the Front Street realignment; (g) to wetlands; and (h) to aesthetics.

76.     On June 15, 2020, Jonathan Crum, of the Federal Highway Administration, again approved PennDOT's application for a categorical exclusion for the Bayfront Parkway Project. Cat. Ex. at 363. Specifically, the Federal Highway Administration determined that, "as supported by the attached Categorical Exclusion Evaluation, this project qualifies for a Level 2 Categorical Exclusion in accordance with 23 C.F.R. 771.117(d), Item Number Other." Cat. Ex. at 363.

77.     The Federal Highway Administration determined that the Bayfront Parkway Project, as proposed, "will not result in any of the four circumstances cited in 23 C.F.R. 771.117(b)." Cat. Ex. at 363.

78.     The Federal Highway Administration's June 15, 2020 approval of PennDOT's application for a categorical exclusion for the Bayfront Parkway Project is a final agency action subject to judicial review.

79.     PennDOT has not held a public hearing on the Bayfront Parkway Project.

80.     Since the Federal Highway Administration approved the categorical exclusion for the Bayfront Parkway Project, dozens of members of the public have asked PennDOT to complete an environmental assessment analyzing alternatives to the proposed project and soliciting public comment on the alternatives. Members of the public and advocacy groups have continued to ask PennDOT to reconsider its decision and complete a full environmental assessment as originally promised. *See* Erie City Council Meeting (September 24, 2020),

https://www.youtube.com/watch?v=3tllCAbzDRI; Letter from Veronica Rexford, Secretary, NAACP Erie Branch 2262, to James Winarski, Erie City Council Chairperson (Aug. 10, 2020); Letter from David Rotenstein, adjunct professor, Goucher College, to Erie City Council (Aug. 2, 2020).

81.     There is substantial controversy on environmental grounds regarding the Bayfront Parkway Project.

82.     On October 21, 2020, PennDOT represented to Erie residents and Erie City Council that the Federal Highway Administration would not allow PennDOT to complete an environmental assessment for the Bayfront Parkway Project. *See* Erie City Council Meeting, October 21, 2020 at 1:05:02; 1:06:23, https://youtu.be/OxoZnvFS5Js.

**The Categorical Exclusion Evaluation**

83.      On June 9, 2020 PennDOT submitted a package of documents, called the Categorical Exclusion Evaluation, to the Federal Highway Administration in support of PennDOT's request to characterize the Bayfront Parkway Project as a categorical exclusion.

84.      PennDOT's Categorical Exclusion Evaluation evaluates PennDOT's selected alternative for the Bayfront Parkway Project.

85.      According to the Categorical Exclusion Evaluation, the project's purpose is to "improve the pedestrian, bicycle, transit, and passenger vehicle connection of [downtown] Erie… and adjacent neighborhoods to the waterfront…, to reduce crashes… on the Bayfront Parkway (SR 4034), to improve future congestion to an acceptable level of service or delay, and to improve traffic operations and efficiency." Cat. Ex. at 7.

*Impacts to Planned Growth*

86.     The Bayfront Parkway Project will expand the capacity of the Bayfront Parkway to accommodate future traffic volumes in anticipation of future growth and development.

87.     The Categorical Exclusion Evaluation states that one of the Bayfront Parkway Project's purposes is "to improve future congestion." Cat. Ex. at 42.

88.     The Categorical Exclusion Evaluation claims that "future year" Level of Service "is projected to be an 'F' with proposed Bayfront Development." Cat. Ex. at 42.

89.     Though the Categorical Exclusion Evaluation does not include traffic projections, it appears to rely on conclusions PennDOT reached in the 2017 Bayfront Parkway Feasibility Study. *See* Bayfront Parkway Feasibility Study.

90.     The 2017 Bayfront Parkway Feasibility Study states that the average daily traffic on the Bayfront Parkway in 2014 was 16,000 vehicles. Bayfront Parkway Feasibility Study at 17.

91.     The 2017 Bayfront Parkway Study relied on a 2014 traffic study to conclude that "2034 Average Daily Traffic[] is anticipated to be approximately 29,000 vehicles per day based upon the application of the future growth within the corridor." Bayfront Parkway Feasibility Study at 27.

92.     The Bayfront Parkway Project plans to modify the Bayfront Parkway so that the roadway can accommodate more traffic with fewer delays.

93.     The Bayfront Parkway Project's design and the Categorical Exclusion Evaluations' statement of the need to reduce future congestion is based on anticipated traffic from a traffic study completed in 2014, six years ago.

94.     The Categorical Exclusion Evaluation does not evaluate the impact that improvements intended to increase traffic flow on 12th Street, an alternate east-west route in Erie, would have on reducing traffic on the Bayfront Parkway.

95.     The Categorical Exclusion Evaluation relies on a traffic study completed in 2014, prior to the 2016 release of Erie's comprehensive plan, Erie Refocused. *See* City of Erie, Pa., *Erie Refocused: Comprehensive Plan and Community Decision-Making Guide* (2016), http://emerge2040.org/wp-content/uploads/2016/10/Erie-Refocused-2016.pdf ("Erie Refocused"). That comprehensive plan advises that "[d]evelopment in Erie must respect the city's pedestrian-centered origins." Erie Refocused at 33. The plan concludes that "Downtown, the Bayfront, and neighborhoods will be recognized as great places when they prioritize pedestrian comfort, safety, and interest." Erie Refocused at 33.

96.     The Categorical Exclusion Evaluation includes "Harbor Place Development" on renderings of the intersection between the Bayfront Parkway and State Street. Cat. Ex at 12.

97.     Harbor Place Development's online marketing materials describe the development as "a dynamic mixed-use development plan that will change the face of Erie's Bayfront!" Erie Harbor Place homepage, https://www.erieharborplace.com/ (last visited Dec. 1, 2020). The website explains that the proposed plan "includes corporate offices, a restaurant, hotels, retail shops, parking garages, an outdoor ice skating rink, condominiums and apartments." *Id*. The website also boasts that "[a] skywalk will connect the complex to UPMC Hamot Hospital, allowing quick covered access for patients and staff." *Id*.

98.     Renderings of the pedestrian bridge across the Bayfront Parkway at Holland Street included in the Categorical Exclusion Evaluation place the pedestrian bridge on the east side of

Holland Street. Cat. Ex. at 163. UPMC Hamot Hospital is located on the west side of Holland Street and the south side of the Bayfront Parkway. Cat Ex. at 163.

99.     PennDOT's BUILD grant application states that "an elevated pedestrian bridge will be added to connect … [UPMC] Hamot Hospital's campus… to the Waterfront District." BUILD Grant Application at 4.

100.    Adding capacity to the parkway will induce additional vehicular traffic to select the Bayfront Parkway when traveling across Erie as opposed to other routes. The increased vehicular capacity of the Bayfront Parkway will encourage more people to drive the route and ultimately will not reduce congestion or traffic volumes.

101.    Where the Categorical Exclusion Evaluation form asks "Will the project induce impacts (positive and negative) on planned growth, land use, or development patterns for the area?" PennDOT answered "Yes." Cat. Ex. at 340.

### *Impacts to Travel Patterns*

102.    The Bayfront Parkway Project will have significant impacts to travel patterns.

103.    Reconfiguring three intersections, including lowering the Bayfront Parkway below State Street and adding ramps from the parkway to State Street, will significantly impact vehicular travel patterns.

104.    Reconfiguring two major intersections to unsignalized roundabouts, which may or may not have pedestrian bridges, will significantly impact travel patterns for pedestrians and cyclists seeking to cross the Bayfront Parkway. Where pedestrian bridges are installed, pedestrians and cyclists will face significantly greater crossing distances to navigate the intersection. This change will be particularly challenging for cyclists and mobility impaired individuals, including wheelchair users, people pushing strollers, young children, the elderly, and the disabled.

105.    The Categorical Exclusion Evaluation did not examine how the project would impact travel patterns by vehicles, pedestrians, or cyclists.

106.    The Categorical Exclusion Evaluation does not discuss how the Bayfront Parkway's new traffic operations will cumulatively and indirectly impact the travel patterns for Erie's transportation system as a whole, given reasonably foreseeable transportation projects in the area, including those at 12th Street and on Front Street.

### *Significant Impacts*

107.    The Bayfront Parkway Project may have significant environmental impacts that PennDOT has not yet evaluated.

### Impacts to Water Quality in Mill Creek and Presque Isle Bay

108.    In the Categorical Exclusion Evaluation, PennDOT asserts that there are "no streams, rivers, & watercourses… present within the Bayfront Parkway Central Corridor Improvements project area." Cat. Ex. at 71.

109.    Mill Creek runs underneath the Bayfront Parkway east of Holland Street and within the Bayfront Parkway Project area. Mill Creek drains into Presque Isle Bay.

110.    A storm drain on the Bayfront Parkway drains water directly from the Bayfront Parkway to Mill Creek.

111.    Stormwater runoff from Bayfront Parkway enters Mill Creek and any pollution contained in the stormwater runoff will impact water quality in Mill Creek and Presque Isle Bay.

112.    Pennsylvania has designated Mill Creek as "impaired" pursuant to Clean Water Act Section 303(d) because Mill Creek fails to meet water quality standards. Mill Creek is impaired for "urban runoff."

113.    Pennsylvania has designated Presque Isle Bay as "impaired" pursuant to Clean Water Act Section 303(d) because Presque Isle Bay fails to meet water quality standards.

114.    "Urban runoff" and "stormwater runoff" are interchangeable terms for precipitation that drains from building roofs, parking lots, sidewalks, streets, and other impervious surfaces, picking up pollution along the way, until it reaches a storm drain and is carried to a creek, stream, or river.

115.    Stormwater runoff from streets contains pollutants, including heavy metals from tires, brakes, and engine wear, and hydrocarbons from lubricating fluids.

116.    Increased traffic on a street leads to more pollution from vehicles and therefore more pollution in stormwater runoff draining from that street.

117.    PennDOT has designed the Bayfront Parkway Project to accommodate more traffic along the Bayfront Parkway above Mill Creek.

118.    Increased impervious surface leads to greater amounts of stormwater runoff.

119.    The Bayfront Parkway Project plans to increase impervious surfaces in the Bayfront by expanding roads. This will lead to additional stormwater runoff.

120.    PennDOT failed to evaluate how much more pollution the additional traffic and impervious surfaces will add to Mill Creek through stormwater runoff from the Bayfront Parkway.

121.    PennDOT failed to evaluate whether increased pollution from increased traffic and increase impervious surfaces on the Bayfront Parkway could contribute to Mill Creek's water quality impairment for "urban runoff" or to Presque Isle's water quality impairment. These impacts may be significant.

### Impacts from Increased Lake Erie and Presque Isle Bay Flooding

122.     The Lake Erie shoreline in Erie significantly flooded in recent years due to heavy rains and changing climate.

123.     The Bayfront Parkway Project proposes to lower the Bayfront Parkway underneath the existing roadway at State Street.

124.     When water levels in Lake Erie are high, water can back up through storm drains and cause flooding further inland.

125.     As recently as November 2020, high winds and waves in Presque Isle Bay caused water levels in the bay to substantially rise. The rising waters spilled out of the bay and flooded nearby roadways and pier amenities like Dobbins Landing. Lisa Adams, *Dobbins Landing Flooded*, Erie News Now, Nov. 15, 2020, https://www.erienewsnow.com/story/42915235/dobbins-landing-flooded.

126.     A lowered roadway may be subject to flood risks.

127.     Increased impervious surfaces and destruction of wetlands exacerbate flooding.

128.     A flooded roadway impacts vehicular traffic, leads to detours and delays, may damage the roadway leading to increased maintenance costs or closures, and threatens users' safety.

129.     PennDOT failed to estimate the frequency and extent of future flooding from Lake Erie onto the Bayfront given climate change and the Bayfront Parkway Project's plan to increase impervious surfaces and permanently destroy wetlands.

130.     PennDOT failed to evaluate the potential impact of that flooding on the lowered Bayfront Parkway. These impacts may be significant.

## Impacts from Hazardous Waste

131.    The Bayfront Parkway Project footprint encompasses land previously occupied by the former GAF Building Materials Manufacturing Corporation.

132.    The former GAF Building Materials Manufacturing Corporation is currently a brownfield site "that contains hazardous materials, waste storage, staining, discoloration, etching, stressed vegetation, storage tanks, sumps or clarifiers, and transformers." Cat. Ex. at 81.

133.    The Bayfront Parkway Project's "proposed Sassafras Street intersection work will encroach on areas that used to be the GAF main office, storage building, and storage tanks." Cat. Ex. at 81.

134.    The Categorical Exclusion Evaluation does not analyze the environmental impacts of disturbing buried hazardous material.

135.    The Categorical Exclusion Evaluation does not identify the precise locations of hazardous materials on the site, characterize any soil or other hazardous materials, or otherwise investigate the location and severity of hazardous materials within the Bayfront Parkway Project footprint.

136.     The Categorical Exclusion Evaluation does not identify which hazardous materials may be present and what threats to human health and the environment those materials pose.

137.     The Categorical Exclusion Evaluation does not address whether there are alternatives to the proposed Bayfront Parkway Project that would not disturb hazardous materials at the former GAF site.

138.    Pennsylvania's Department of Environmental Protection ordered PennDOT to obtain an NPDES permit due to the presence of hazardous materials within the construction corridor at the GAF site which is already designated a brownfield site. Cat. Ex. at 75, 81

139.     PennDOT acknowledges that the CSX railroad below State Street contains hazardous polychlorinated biphenyl (PCB) contamination in its soil due to past railroad emissions. Cat. Ex. at 17, 25. The railroad's removal will result in the discharge and disturbance of this contaminated soil. The Categorical Exclusion Evaluation does not address the environmental impacts related to dispersal of PCBs during the course of the Bayfront Parkway Project.

140.     PennDOT failed to analyze how the existence of hazardous waste sites would be impacted by construction, how to mitigate the subsequent impacts, or what alternatives could be used to avoid or minimize potential impacts caused by disturbing hazardous waste sites.

141.     The impact of hazardous wastes on human health and the environment due to the Bayfront Parkway Project may be significant.

Impacts to Environmental Justice Communities

142.     The Categorical Exclusion Evaluation documentation recognizes that the Bayfront Parkway Project is subject to Executive Order 12,898, which requires PennDOT to conduct an environmental justice analysis. Cat. Ex. at 341.

143.     Given the high rates of impoverished residents and communities of color living in the neighborhoods adjacent to the Bayfront Parkway Project, Executive Order 12,898 requires PennDOT to analyze potential impacts to those communities to ensure they will not be disproportionately and adversely affected by the project.

144.     Neighborhoods adjacent to the eastern portion of the Bayfront Parkway project are home to many low-income residents and people of color.

145.     The Categorical Exclusion Evaluation recognized that there are people of color living near the Bayfront Parkway, but otherwise failed to adequately characterize the environmental justice communities impacted by the project. This failure to understand the community and the

vulnerabilities and challenges its residents face prior to analyzing the Bayfront Parkway Project's impact on those communities renders PennDOT's conclusions about the impacts baseless and incomplete.

146.     The Categorical Exclusion Evaluation did not address how PennDOT's chosen design for the Bayfront Parkway Project would impact the adjacent environmental justice communities' access to the Bayfront, mobility needs, health and safety, or access to the benefits of the project.

147.     PennDOT failed to examine the number and percentage of residents living adjacent to the Bayfront Parkway Project that do not have access to a vehicle and the impact of the proposed design on carless residents.

148.     Census data compiled from 2013-2017 reflects that 35% of residents in zip code 16503, adjacent to the Bayfront Parkway, do not have access to a vehicle. *Zip Code Tabulation Areas – 5-Year Data*, Diversity Data Kids (Search "16503"; scroll to "2013-2017" year values) (last visited Dec. 12, 2020).

149.     PennDOT failed to consider the percentage of children living in the adjacent community and how the selected alternative for the Bayfront Parkway Project would impact children.

150.     Upon information and belief, approximately 30% of the population of zip code 16503 is under the age of 18. CartoChrome Overall Health Index, *Health Index for Erie, PA*, https://www.cartochrome.com/overall-health-index/pa/16503-erie-pennsylvania/ (last visited Dec. 14, 2020).

151.     PennDOT failed to consider whether children are likely to use a pedestrian bridge or will run across a highway when crossing from their neighborhood to Bayfront amenities like the public library, how much farther a caregiver will have to push a stroller to cross a pedestrian

34

bridge to the library, and whether a pedestrian bridge actually increases safety and access for children and their caregivers.

152.    PennDOT failed to consider the effects of nearly doubling average daily traffic from 16,000 vehicles per day to 29,000 vehicles per day on local air pollution levels, the health of local residents, and pedestrian safety. Bayfront Parkway Feasibility Study at 27.

153.    PennDOT failed to examine health issues faced by residents in the environmental justice communities, including asthma, heart conditions, mobility impairments, visual impairment, or other health conditions that would be negatively impacted by increased numbers of vehicles on the Bayfront Parkway, longer crossing distances for the intersections, and unsignalized roundabouts.

154.    PennDOT failed to examine the existing heat island conditions in the environmental justice community and how those conditions relate to past discriminatory practices. A study comparing heat conditions in neighborhoods reveals that Erie's redlined neighborhoods were 3.93 degrees Celsius warmer during the summer than non-redlined neighborhoods. *See* Jeremy Hoffman et al., *The Effects of Historical Housing Policies on Resident Exposure to Intra-Urban Heat: A study of 108 US Urban Areas*, 8 Climate 12 (2020).

155.    The neighborhoods adjacent to the Bayfront Parkway were redlined—categorized as the most dangerous and least desirable neighborhoods in Erie where people of color were forced to live due to discriminatory lending practices. *See* Jonathan Burdick, *Tracing Erie's History of Redlining*, Erie Reader, Feb. 13, 2019, https://www.eriereader.com/article/tracing-eries-history-of-redlining.

156.     PennDOT failed to examine how additional traffic on the Bayfront Parkway will lead to increased greenhouse gas emissions, contributing to climate change, which has disproportionate impacts on communities of color and low-income communities.

157.     The most recent analysis of the intersection between environmental justice and transportation issues in Erie indicates that more than 60 percent of pedestrian- and bicycle-related crashes occurred in minority or low-income neighborhoods. Transportation EJ Analysis at 8. Forty percent of fatal crashes occurred in areas with higher than average low-income populations. *Id.* at 9.

158.     In this report, Erie's Metropolitan Planning Organization devised a qualitative ranking system to evaluate the potential impact of proposed transportation projects on environmental justice communities. Transportation EJ Analysis at 12–13. Using this qualitative analysis when assessing the impacts of the Bayfront Parkway project, this report concluded the project will have a high impact on environmental justice communities and provides a lower potential for benefits to accrue to the community. Transportation EJ Analysis. at 23. PennDOT's evaluation ignored this finding.

159.     The Categorical Exclusion Evaluation does not discuss how the project will negatively impact access to public facilities including educational facilities like the library, transportation facilities like the bus station, or recreational spaces like the mini-golf course adjacent to the Bayfront. Cat. Ex. at 340.

160.     Exposure to traffic pollution has been linked to many adverse health effects including: making asthma symptoms worse, decreased lung function, cardiovascular disease, adverse birth outcomes, and childhood cancer. Exposure to higher concentrations of traffic pollution can affect the health of people who live, ride in vehicles, and walk or bicycle near roadways. A person's

health may be affected by both short- and long-term exposure to traffic pollution. Some groups may be at higher risk including: children, the elderly, low-income populations, and people with medical conditions, such as asthma and cardiovascular disease.

161.    The Categorical Exclusion Evaluation failed to consider the health impacts, particularly those on vulnerable populations in the adjacent environmental justice communities, caused by the Bayfront Parkway Project's proposal to nearly double vehicles per day on the parkway. PennDOT's conclusion that reduced congestion would lead to less air pollution ignores the fact that PennDOT is expanding the Bayfront Parkway so it can handle more than double the current daily vehicle traffic.

162.    The Categorical Exclusion Evaluation fails to consider the noise impacts of increased traffic volumes. Although PennDOT admits that traffic volumes will double on the Parkway, the noise study used the much lower "average future traffic volume forecast" instead of studying the noise from doubled traffic volumes. The additional noise from the doubled traffic volumes may significantly impact the adjacent environmental justice community.

163.    The Categorical Exclusion Evaluation fails to provide evidence or analysis supporting its conclusion that the Bayfront Parkway Project will have positive impacts on pedestrians and the adjacent environmental justice communities. Cat. Ex. at 340.

164.    The Bayfront Parkway Project's reduced street level access points and a high-speed road way blocking access will disrupt community cohesion, disrupt access to public benefits and services, exclude or separate low income communities from the broader community, and deny these communities the purported benefits the Bayfront receives as it now operates as a fortified barrier to these residents.

<u>Impacts Related to Greenhouse Gas Emissions and Climate Change</u>

165.     On January 18, 2019, Pennsylvania's Governor Tom Wolf issued Executive Order 2019-01. Executive Order 2019-01 established a goal of "a 26 percent reduction of net greenhouse gas emissions statewide by 2025 from 2005 levels, and an 80 percent reduction of net greenhouse gas emissions by 2050 from 2017 levels."

166.     Executive Order 2019-01 mandated that "all agencies under the Governor's jurisdiction shall… [c]ollectively reduce overall energy consumption by 3 percent per year and 21 percent by 2025 from 2017 levels" and "evaluate opportunities for the reduction of vehicle miles traveled."

167.     Pennsylvania's Climate Action Plan acknowledges that "88 percent of Pennsylvania's greenhouse gas emissions came from energy consumption and energy production in 2015." Pa. Dep't Env't Prot., *Pennsylvania Climate Action Plan Summary Booklet* 5 (2018) ("PA Climate Action Plan Summary"). The Climate Action Plan recognizes that "[t]he biggest source of emissions is energy consumption: transportation—personal vehicles and fleet fuel." PA Climate Action Plan Summary at 5.

168.     The Pennsylvania Climate Action Plan estimates that reducing vehicle miles traveled for single occupancy vehicles will lead to greenhouse gas reductions of 573,260 metric tons of carbon dioxide equivalent by 2025 and 2,820,936 metric tons of carbon dioxide equivalent by 2050 with a cost savings of $447 per ton of greenhouse gases reduced. Pa. Dep't Env't Prot., *Pennsylvania Climate Action Plan* 53 (2018) ("PA Climate Action Plan").

169.     The Pennsylvania Climate Action Plan greenhouse gas reduction targets are based on an overall vehicle miles traveled reduction target of 3.4 percent by 2030 and 7.5 percent of total vehicle miles traveled from baseline automotive use by 2050. PA Climate Action Plan at A-9.

170. The Pennsylvania Climate Action Plan states that the "Commonwealth of Pennsylvania plans to advance" sustainable transportation planning and practices "by promoting, expanding opportunities for, and incentivizing ride sharing, walking, bicycling, and public transit options." PA Climate Action Plan at 59.

171. PennDOT failed to consider the impact the Bayfront Parkway Project, as proposed, would have on vehicle miles traveled and greenhouse gas emissions.

172. PennDOT failed to evaluate opportunities to reduce vehicle miles traveled when selected a preferred alternative for the Bayfront Parkway Project.

173. PennDOT's proposed design for the Bayfront Parkway Project, which increases lanes and is designed to move more traffic across the Bayfront more quickly, relies heavily on its assumption that traffic on the Bayfront Parkway will nearly double by 2034. PennDOT failed to consider how its design of a larger, faster parkway will induce traffic and lead to an increase in Vehicle Miles Traveled.

174. PennDOT failed to consider alternative designs for the Bayfront Parkway Project that would increase mobility for pedestrians and cyclists while also reducing Vehicle Miles Traveled.

<u>Impacts from the Front Street Realignment Project</u>

175. The Port of Erie's 2018 Master Plan recognizes that the Bayfront Parkway Project "will have a significant impact on the circulation within and around" the Bayfront area. Erie Port Master Plan at 71.

176. The Port Master plan acknowledges, "[a]s the Bayfront Parkway is converted into a limited access highway in between Sassafras and Holland Street, with proposed roundabouts at each intersection, a need for a local connecting street has emerged." Erie Port Master Plan at 71.

177.    In conjunction with its proposal to expand the Bayfront Parkway to accommodate more traffic at faster speeds, PennDOT proposed an extension of Front Street "within the Bayfront area from State Street to Sassafras" mere feet from the expanded Bayfront Parkway, known as the "Front Street Realignment" project. Erie Port Master Plan at 71.

178.    The purpose of the Front Street Realignment project is to provide a pedestrian-oriented loop that connects the occupants and activities from the three proposed developments: Bayfront Place, Harbor Place, and Dobbins Landing. Erie Port Master Plan at 71. Bayfront Place is a 29 acre site owned by Erie Events that includes the former GAF shingle plant property and the land occupied by the Bayfront Convention Center and the Courtyard by Marriott Erie Bayfront Hotel. *See FAQ,* Bayfront Place website, http://www.eriebayfrontplace.com/vision/faq/. Dobbins Landing, located at the edge of Presque Isle Bay at the end of State Street, is currently home to a wharf and adjoining facilities, including the Bicentennial Tower and the Sheraton Erie Hotel. Plans for the future of Dobbins Landing are vague but include "potentially adding a Ferris wheel, tram to Presque Isle, a swing mechanism over the water," and a restaurant. Erie Port Master Plan at 5.

179.    The Front Street Realignment project would displace the Wolverine marina and the adjacent miniature golf course, GEM City marina, and Presque Isle Yacht Club. Erie Port Master Plan at 71.

180.    PennDOT did not analyze the impacts of the Front Street Realignment project.

Wetlands Impacts

181.    The Bayfront Parkway Project will involve "[p]ermanent wetland fill in order to construct [the roundabout at the] Holland street intersection." Cat. Ex. at 73.

182.     The Categorical Exclusion Evaluation fails to evaluate alternatives to building a roundabout at the Holland Street intersection that would not permanently destroy wetlands.

183.     The Categorical Exclusion Evaluation fails to consider how the Bayfront Parkway Project's permanent destruction of wetlands will exacerbate flooding risks since the wetlands will no longer be available to absorb stormwater runoff.

184.     There are practicable alternatives to building a roundabout at the Holland Street intersection that would meet the project's purpose and not destroy wetlands.

Aesthetic Impacts

185.     The Bayfront Parkway Project proposes to lower the parkway below State Street to allow vehicles continuing on the parkway past State Street to bypass the intersection with State Street.

186.     While this design feature is intended to speed traffic, this new and unusual intersection configuration will require vehicles to be in the correct lane to either approach or bypass the State Street intersection.

187.     Given that the distance between Holland Street and State Street is less than 350 yards and the distance between Sassafras Street and State Street is likewise less than 350 yards, PennDOT will need to install large, descriptive signs to inform drivers which lane they need to be in.

188.     PennDOT failed to consider the need for signage regarding the State Street intersection bypass and the effect that signage would have on the aesthetics of the Bayfront Parkway and the Bayfront in general. These impacts are potentially significant.

## Air Quality Impacts

189.     The proposed project estimates that future traffic volumes will double in size. This substantial increase in car traffic may impact the quality of ground level air quality for pedestrians and cyclists using the Bayfront Parkway as well as for neighbors living adjacent to the parkway.

190.     The Categorical Exclusion Evaluation fails to consider how the increased amount of emissions generated by increased volumes of car traffic will impact air quality for pedestrians, cyclists, and residents who are directly exposed to increased levels of localized, ground-level air pollution.

### *The Project's Purpose: Improving Pedestrian and Bicycle Connections*

191.     The Categorical Exclusion Evaluation provides no evidence or analysis demonstrating how the proposed Bayfront Parkway Project will meet the project's stated purpose and actually improve pedestrian and bicycle connections between downtown Erie and the Bayfront.

192.     The Categorical Exclusion Evaluation fails to analyze how pedestrian bridges—the single major construction feature attentive to the needs of pedestrians—would impact pedestrian travel.

193.      Where pedestrian bridges are installed, pedestrians and cyclists will face significantly greater crossing distances to navigate the intersection. This change will be particularly challenging for cyclists and mobility-impaired individuals—including but not limited to wheelchair users, people pushing strollers, young children, the elderly, and the disabled—and will decrease pedestrian and cyclist connections between downtown Erie and the Bayfront.

194.     The Federal Highway Administration recognizes that pedestrian bridges are a "measure of last resort." Fed. Highway Admin., Publication No. FHWA-RD-01-102, *Pedestrian Facilities*

42

*Users Guide — Providing Safety and Mobility* 49 (2002) ("Pedestrian Guide"). The Administration recognizes that pedestrian bridges are "extremely high-cost and visually intrusive." *Id.*

195.     The Federal Highway Administration acknowledges that "[e]xtensive ramping will accommodate wheelchairs and bicyclists, but results in long crossing distances and steep slopes that discourage use." *Pedestrian Guide at 49.* It also cites to studies showing that "many pedestrians will not use an overpass… if they can cross at street level in about the same amount of time." *Id.* The Federal Highway Administration ultimately recommends that pedestrian bridges are "most feasible and appropriate in extreme cases where pedestrians must cross roadways such as freeways and high-speed, high-volume arterials." *Id.*

196.     PennDOT failed to analyze traffic calming designs beyond roundabouts that could slow traffic speeds and accommodate pedestrian infrastructure, improving pedestrian and cyclist connections between downtown Erie and the Bayfront.

197.     The Categorical Exclusion Evaluation fails to identify existing modal needs and current travels patterns for non-vehicle travel. It provides no origin and destination analysis nor information on current volumes of users. It provides no analysis of safety or of connectivity to support its conclusion that pedestrians' travel patterns will not be adversely impacted. It also does not provide any analysis to demonstrate that it will improve connectivity or safety for these modal groups.

198.     By prioritizing vehicular traffic and inducing higher traffic volumes on the Bayfront Parkway, PennDOT's proposed Bayfront Parkway Project reinforces the Bayfront Parkway as a barrier between downtown Erie and the Bayfront, particularly for pedestrians and cyclists.

199.    The throughway underpass below State Street will accelerate the diversion of 80% of

Erie's traffic out of Erie. Cat. Ex. at 54. This feature contravenes the underlying purpose of the

design, which is to integrate downtown and the Bayfront and use the Bayfront as a catalyst for

economic growth throughout the City. Allowing through traffic to shoot through the Bayfront

without pause at these intersections undermines Erie's plan to funnel traffic into these major

commercial districts to stimulate the economy. This design will induce impacts to planned

growth and land use in this area.

<b>Public Involvement and Controversy</b>

200.    The Bayfront Parkway Project is a Federal-aid highway project involving the Bayfront

Parkway, which cuts through the city of Erie, Pennsylvania and plans to substantially modify

three intersections between the Bayfront Parkway and city streets—Holland Street, State Street,

and Sassafras Street. The Bayfront Parkway Project will change the layout and function of these

three intersections.

201.    The Federal Highway Administration determined there was "no substantial controversy"

regarding the Bayfront Parkway Project on April 15, 2020. Cat. Ex. at 40.

202.    At the time the Federal Highway Administration determined there was "no substantial

controversy," local residents and City Council members believed that PennDOT would be

completing an environmental assessment. They expected that the environmental assessment

would identify multiple alternatives for the project, examine whether those alternatives met the

project purpose of improving pedestrian and cyclist access, and compare the environmental

impacts of each alternative.

203.    When advocates and local officials learned that PennDOT was seeking a categorical

exclusion, they objected to the use of a categorical exclusion for the Bayfront Parkway Project

44

and asked PennDOT to complete an environmental assessment. *See* Letter from Veronica Rexford, Secretary, NAACP Erie Branch 2262, to James Winarski, Erie City Council Chairperson (Aug. 10, 2020); Letter from David Rotenstein, adjunct professor, Goucher College, to Erie City Council (Aug. 2, 2020); Letter from Ben Crowther, Program Manager, The Congress for New Urbanism, to elected leaders of Erie, PA (July 9, 2020); Letter from Erie Bayfront Coalition to elected leaders of Erie, PA (June 10, 2020); Letter from Sarah Bennett, Clean Water Advocacy Campaign Manager, PennFuture, to Mark Nicholson, Pa. Dep't Transp. (June 4, 2020). Advocates and local officials were particularly interested in alternatives to the Bayfront Parkway Project that would prioritize pedestrians and cyclists and would have fewer environmental impacts.

204.    The Categorical Exclusion Evaluation, submitted on June 9, 2020, failed to acknowledge the letter from Concerned Citizens for Pennsylvania's Future, asking PennDOT to abandon its request for approval of a categorical exclusion and conduct an environmental assessment so that the public would have information on the environmental impacts, including how the project will impact water resources and restrict pedestrian and bicyclist access to these resources. This letter and other similar requests by members of the public refute Federal Highway Administration's assertion that the Bayfront Parkway Project "has resulted in no substantial controversy." Cat. Ex. at 40.

205.    Erie residents, including members of Erie City Council, have requested PennDOT hold a formal public hearing, particularly in light of its decision to deny the public an environmental assessment for review and comment prior to selecting a final alternative for the Bayfront Parkway Project.

206.    PennDOT has not held a public hearing on the Bayfront Parkway Project.

207.    PennDOT has not provided an opportunity for a public hearing on the Bayfront Parkway Project.

208.    PennDOT did not certify to the Secretary of the U.S. Department of Transportation that it has had public hearings or has afforded the opportunity for such hearings.

209.    PennDOT did not submit to the Administration a transcript of any public hearing on the Bayfront Parkway Project, nor did it submit a certification that a required hearing or hearing opportunity was offered.

210.    The Federal Highway Administration did not enforce PennDOT's legal requirement to hold a hearing and approved the categorical exclusion despite the procedural error.

## FIRST CLAIM

**THE ADMINISTRATION'S APPROVAL OF A CATEGORICAL EXCLUSION FOR THE PROJECT VIOLATES THE LAW BECAUSE THE PROJECT WILL INDUCE SIGNIFICANT IMPACTS ON PLANNED GROWTH.**

211.    Paragraphs 1- 210 are incorporated as if fully set forth herein.

212.    The Federal Highway Administration approved a categorical exclusion for the Bayfront Parkway Project on June 15, 2020.

213.    The Federal Highway Administration's regulations implementing NEPA prohibit the use of a categorical exclusions where a project "induce[s] significant impacts to planned growth or land use for the area." 23 C.F.R. § 771.117(a).

214.    The Bayfront Parkway Project will expand the capacity of the Bayfront Parkway to accommodate future traffic volumes in anticipation of future growth and development.

215.    The vehicle-focused changes proposed by the Bayfront Parkway Project that are intended to reduce congestion and accommodate more traffic will induce more traffic to use the Bayfront Parkway.

216.    The Bayfront Parkway Project will therefore induce significant impacts on planned growth and land use.

217.    The Federal Highway Administration's approval of a categorical exclusion for the Bayfront Parkway Project action violates NEPA and the Federal Highway Administration's regulations implementing NEPA and is therefore contrary to law.

## SECOND CLAIM

### THE ADMINISTRATION'S APPROVAL OF A CATEGORICAL EXCLUSION FOR THE PROJECT VIOLATES THE LAW BECAUSE THE PROJECT WILL HAVE SIGNIFICANT IMPACTS ON TRAVEL PATTERNS.

218.    Paragraphs 1- 210 are incorporated as if fully set forth herein.

219.    The Federal Highway Administration's regulations implementing NEPA prohibit the use of a categorical exclusion where a project "[has] significant impacts travel patterns…." 23 C.F.R. § 771.117(a).

220.    The Bayfront Parkway Project replaces two intersections with roundabouts and lowers the Bayfront Parkway below State Street.

221.    The Bayfront Parkway Project replaces street level crossings with pedestrian bridges.

222.    The Bayfront Parkway Project's proposed changes to the intersections between the Bayfront Parkway and Holland Street, State Street, and Sassafras Street will have significant impacts on travel patterns of pedestrians and cyclists.

223.    The Bayfront Parkway Project's proposed changes will have significant impacts on vehicular travel patterns.

224.    The Federal Highway Administration's approval of a categorical exclusion for the Bayfront Parkway Project action violates NEPA and the Federal Highway Administration's regulations implementing NEPA and is therefore contrary to law.

47

## THIRD CLAIM

## THE ADMINISTRATION'S ISSUANCE OF A CATEGORICAL EXCLUSION VIOLATES THE LAW BECAUSE THE BAYFRONT PARKWAY PROJECT DOES NOT FALL WITHIN A CATEGORY OF ACTIONS THAT THE FEDERAL HIGHWAY ADMINISTRATION HAS ALREADY DETERMINED HAVE NO SIGNIFICANT IMPACTS.

225.    Paragraphs 1- 210 are incorporated as if fully set forth herein.

226.    NEPA regulations define a "categorical exclusion" as "a ***category*** of actions which do not individually or cumulatively have a significant effect on the human environment and which have been found to have no such effect in procedures adopted by a Federal agency." 40 C.F.R. § 1508.4 (emphasis added).

227.    The Federal Highway Administration's categorical exclusion regulations further define categorical exclusion as actions that both meet the definition contained in 40 C.F.R. § 1508.4 "and, based on [the Administration's] past experience with similar actions," do not involve significant environmental impacts. 23 C.F.R. § 771.117(a).

228.    The Federal Highway Administration's categorical exclusion regulations divide categorical exclusions into two categories: those that "normally do not require any further NEPA approvals" by the Federal Highway Administration and those that may be designated categorical exclusions "only after Administration approval." 23 C.F.R. § 771.117(c),(d).

229.    For categorical exclusions that require approval from the Federal Highway Administration, the regulations require the applicant to "submit documentation that demonstrates that the specific conditions or criteria for these [categorical exclusions] are satisfied, and that significant environmental effects will not result." 23 C.F.R. § 771.117(d).

230.    The Bayfront Parkway Project does not fit within a category of actions which the Federal Highway Administration has found to have no significant effect on the human environment.

48

231.    In its application for a categorical exclusion, PennDOT failed to identify a "category of actions" designated by the Federal Highway Administration into which the Bayfront Parkway Project fits.

232.    PennDOT failed to submit documentation that demonstrates that the Project satisfies "the specific conditions or criteria" for a categorical exclusion under 23 C.F.R. § 771.117(d) and that significant environmental effects will not result.

233.    The Federal Highway Administration has not provided any evidence showing that it has previously found that projects like the proposed Bayfront Parkway expansion have no significant effect on the human environment.

234.    The Federal Highway Administration's approval of a categorical exclusion for the Bayfront Parkway Project violates NEPA and Federal Highway Administration regulations and is therefore contrary to law.

## FOURTH CLAIM

### THE ADMINISTRATION'S APPROVAL OF A CATEGORICAL EXCLUSION FOR THE BAYFRONT PARKWAY PROJECT IS ARBITRARY AND CAPRICIOUS BECAUSE PENNDOT FAILED TO EXAMINE POTENTIALLY SIGNIFICANT IMPACTS.

235.    Paragraphs 1- 210 are incorporated as if fully set forth herein.

236.    A categorical exclusion is only appropriate where the proposed project does not involve significant environmental impacts. 40 C.F.R. § 1508.4; 23 C.F.R. § 771.117.

237.    PennDOT failed to examine potentially significant impacts prior to applying to the Federal Highway Administration for approval of a categorical exclusion for the Bayfront Highway Project.

### *Potentially Significant Impacts to Mill Creek and Presque Isle Bay*

238.　Pennsylvania's Clean Streams Law prohibits the discharge of any substance into waters of the Commonwealth "any substance of any kind or character resulting in pollution." 35 Pa. Stat. and Cons. Stat. § 691.1; Section 401 (West 1937). The law defines "pollution" to include "contamination of any waters of the Commonwealth such as will… render such waters… detrimental... to… beneficial uses, or to… fish or other aquatic life." *Id*. Section 1.

239.　Increased traffic and increased impervious surfaces on the Bayfront Parkway will cause more pollution on the street and lead to more pollution in the stormwater runoff draining to Mill Creek.

240.　Increased traffic and increased impervious surfaces on Bayfront Parkway may contribute to Mill Creek's impairment, which is caused by urban runoff, and would contribute to the violation of a water quality standard.

241.　Increased traffic and increased impervious surfaces on the Bayfront Parkway may contribute to Presque Isle Bay's impairment and would contribute to the violation of a water quality standard.

242.　Increased pollution to Mill Creek and Presque Isle Bay due to increased traffic and increased impervious surfaces on the Bayfront Parkway may contribute to violation of water quality standards, which is a significant environmental impact.

243.　PennDOT's failure to acknowledge the existence of Mill Creek within the Bayfront Parkway Project area and to examine the Bayfront Parkway Project's potentially significant impacts to Mill Creek and Presque Isle Bay violates NEPA.

244.　PennDOT's failure to acknowledge the existence of Mill Creek within the Bayfront Parkway Project area and to examine the Bayfront Parkway Project's potentially significant

impacts to Mill Creek and Presque Isle Bay renders PennDOT's conclusion that the Bayfront Parkway Project will have no significant impacts arbitrary and capricious and unsupported by the record.

245.     PennDOT's failure to acknowledge the existence of Mill Creek within the Bayfront Parkway Project area and to examine the Bayfront Parkway Project's potentially significant impacts to Mill Creek and Presque Isle Bay renders the Federal Highway Administration's conclusion that the Bayfront Parkway Project will have no significant impacts arbitrary and capricious and unsupported by the record.

246.     PennDOT's failure to acknowledge the existence of Mill Creek within the Bayfront Parkway Project area and to examine the Bayfront Parkway Project's potentially significant impacts to Mill Creek and Presque Isle Bay renders the Federal Highway Administration's approval of a categorical exclusion for the Bayfront Parkway Project arbitrary and capricious, a violation of NEPA, and contrary to law.

### *Potentially Significant Impacts from Increased Lake Erie Flooding*

247.     PennDOT failed to examine the impact of Lake Erie flooding on the lowered Bayfront Parkway.

248.     Flooding of the Bayfront Parkway during Lake Erie flooding may be a significant environmental impact.

249.     PennDOT's failure to examine the impact of Lake Erie flooding on the Bayfront Parkway Project renders PennDOT's conclusion that the Bayfront Parkway Project will have no significant impacts arbitrary and capricious and unsupported by the record.

250.     PennDOT's failure to examine the impact of Lake Erie flooding on the Bayfront Parkway Project renders the Federal Highway Administration's conclusion that the Bayfront Parkway Project will have no significant impacts arbitrary and capricious and unsupported by the record.

251.     PennDOT's failure to examine the impact of Lake Erie flooding on the Bayfront Parkway Project Bay renders the Federal Highway Administration's approval of a categorical exclusion for the Bayfront Parkway Project arbitrary and capricious, a violation of NEPA, and contrary to law.

### *Potentially Significant Impacts from Hazardous Waste*

252.     The Bayfront Parkway Project encompasses land previously occupied by the former GAF Building Materials Manufacturing Corporation, which is currently a brownfield site containing hazardous materials.

253.     The proposed Bayfront Parkway Project will disturb areas where hazardous materials have been stored.

254.     PennDOT failed to identify the nature and extent of contamination that would be disturbed through the Bayfront Parkway Project, to assess the potential impacts of those hazardous wastes, to identify alternatives that would not disturb the former GAF site, to identify mitigation measures to reduce any impacts from hazardous waste at the site, or to assess the nature and severity of impacts of hazardous waste on human health and the environment.

255.     PennDOT's failure to analyze the nature and extent of contaminated material within the Bayfront Parkway Project area renders PennDOT's conclusion that the Bayfront Parkway Project will have no significant impacts arbitrary and capricious and unsupported by the record.

256.     PennDOT's failure to analyze the nature and extent of contaminated material within the Bayfront Parkway Project area renders the Federal Highway Administration's conclusion that the

Bayfront Parkway Project will have no significant impacts arbitrary and capricious and unsupported by the record.

257.    PennDOT's failure to analyze the nature and extent of contaminated material within the Bayfront Parkway Project area renders the Federal Highway Administration's approval of a categorical exclusion for the Bayfront Parkway Project arbitrary and capricious, a violation of NEPA, and contrary to law.

### *Potentially Significant Impacts to Environmental Justice Communities*

258.    Given the racial and economic make-up of the people living in neighborhoods adjacent to the Bayfront Parkway Project, Executive Order 12,898 requires PennDOT to analyze potential impacts to those communities to ensure there will not be "disproportionately high and adverse human health or environmental effects."

259.    PennDOT failed to characterize and understand the makeup, vulnerabilities, and challenges the adjacent environmental justice communities face beyond recognizing that the neighborhoods adjacent to the Bayfront Parkway are home to many people of color. PennDOT's failure to understand the neighborhood and the challenges its residents face renders PennDOT's conclusions that the Bayfront Parkway Project will not disproportionately and adversely affect the communities arbitrary and capricious.

260.    PennDOT's failure to analyze the Bayfront Parkway Project's impacts on mobility, heat island, health, air quality, noise and other issues specifically on the environmental justice communities adjacent to the Bayfront Parkway Project renders its conclusion that there are no significant impacts on the environmental justice communities arbitrary and capricious.

### *Potentially Significant Impacts Related to Greenhouse Gas Emissions and Climate Change*

261.    Pennsylvania's Executive Order 2019-01 directs PennDOT to "evaluate opportunities for the reduction of vehicle miles traveled."

262.    PennDOT failed to evaluate opportunities for the reduction of vehicle miles traveled when selecting a design for the Bayfront Parkway Project, violating Executive Order 2019-01.

263.    Designing the Bayfront Parkway Project to accommodate more vehicles per day and therefore more vehicle miles traveled undermines Pennsylvania's efforts to reduce vehicle miles traveled and greenhouse gas emissions from vehicles in order to combat climate change.

264.    Designing the Bayfront Parkway Project to accommodate more traffic when Pennsylvania is trying to reduce vehicle miles traveled to reduce greenhouse gases and combat climate change is a significant environmental impact.

265.    PennDOT's failure consider the impact the Bayfront Parkway Project would have on vehicle miles traveled and greenhouse gas emissions and evaluate opportunities for the Bayfront Parkway Project to reduce vehicle miles traveled and meet Pennsylvania's greenhouse gas emission goals violates Executive Order 2019-01 and is therefore contrary to law.

266.    PennDOT's failure to consider the potentially significant impact the Bayfront Parkway Project would have on vehicle miles traveled and greenhouse gas emissions and evaluate opportunities for the Bayfront Parkway Project to reduce vehicle miles traveled and meet Pennsylvania's greenhouse gas emission goals renders PennDOT's conclusion that the Bayfront Parkway Project will have no significant impacts arbitrary and capricious and unsupported by the record.

267.    PennDOT's failure to consider the potentially significant impact the Bayfront Parkway Project would have on vehicle miles traveled and greenhouse gas emissions and evaluate

opportunities for the Bayfront Parkway Project to reduce vehicle miles traveled and meet Pennsylvania's greenhouse gas emission goals renders the Federal Highway Administration's conclusion that the Bayfront Parkway Project will have no significant impacts arbitrary and capricious and unsupported by the record.

268.    PennDOT's failure to consider the potentially significant impact the Bayfront Parkway Project would have on vehicle miles traveled and greenhouse gas emissions and evaluate opportunities for the Bayfront Parkway Project to reduce vehicle miles traveled and meet Pennsylvania's greenhouse gas emission goals renders the Federal Highway Administration's approval of a categorical exclusion for the Bayfront Parkway Project arbitrary and capricious, a violation of NEPA, and contrary to law.

### *Potentially Significant Impacts from the Front Street Realignment Project*

269.    The Front Street Realignment project is a reasonably foreseeable indirect impact of the Bayfront Parkway Project.

270.    If PennDOT had selected a pedestrian-oriented design for the Bayfront Parkway Project, the Front Street Realignment Project would be unnecessary.

271.    PennDOT failed to examine reasonably foreseeable indirect and cumulative impacts from the Bayfront Parkway Project.

272.    NEPA prohibits segmentation to avoid complete environmental review. To prevent segmentation, the Federal Highway Administration requires that "[a]ny action evaluated under NEPA… must… [n]ot restrict consideration of alternatives for other reasonably foreseeable transportation improvements." 23 C.F.R. § 771.111(f)(3)

273.     PennDOT's proposed design for the Bayfront Parkway precludes a "no action alternative" for the Front Street Realignment in order to meet the Port's need for a pedestrian-oriented road to move people around the Bayfront.

274.     PennDOT's failure to examine the potentially significant impacts of the Front Street Realignment project during the Bayfront Parkway's NEPA process is improper segmentation and a failure to analyze potentially significant impacts.

275.     PennDOT's failure consider the potentially significant impact of the Front Street Realignment project renders PennDOT's conclusion that the Bayfront Parkway Project will have no significant impacts arbitrary and capricious and unsupported by the record.

276.     PennDOT's failure consider the potentially significant impact of the Front Street Realignment project renders the Federal Highway Administration's conclusion that the Bayfront Parkway Project will have no significant impacts arbitrary and capricious and unsupported by the record.

277.     Because the Front Street Realignment project will displace the miniature golf course, a marina and a yacht club, the Bayfront Parkway Project will have significant impacts on recreational resources at the Bayfront.

278.     The Federal Highway Administration's regulations prohibit a categorical exclusion for a project that has a significant impact on any recreational resource. 23 C.F.R. § 771.117(a).

279.     The Federal Highway Administration's approval of a categorical exclusion for the Bayfront Parkway Project, which will indirectly cause displacement of a miniature golf course, a marina, and a yacht club, violates NEPA and the Federal Highway Administration's regulations implementing NEPA and is therefore contrary to law.

*Potentially Significant Aesthetic Impacts*

280.     The Bayfront Parkway Project proposes to lower the parkway below State Street to allow vehicles continuing on the parkway past State Street to bypass the intersection with State Street.

281.     PennDOT failed to consider the need for signage regarding the State Street intersection bypass and the effect that signage would have on the aesthetics of the Bayfront Parkway and the Bayfront in general.

*Potentially Significant Air Quality Impacts*

282.     The proposed project estimates that future traffic volumes will double in size. This substantial increase in car traffic may impact the quality of ground level air quality for pedestrians and cyclists using the Bayfront Parkway as well as for neighbors living adjacent to the parkway.

283.     The Categorical Exclusion Evaluation fails to consider how the increased amount of emissions generated by increased volumes of car traffic will impact air quality for pedestrians, cyclists, and residents who are directly exposed to increased levels of localized, ground-level air pollution.

284.     PennDOT failed to consider the impact the Bayfront Parkway Project would have on ground-level air quality for pedestrians, cyclists, and residents.

### **FIFTH CLAIM**

### **PENNDOT'S FAILURE TO COMPLY WITH EXECUTIVE ORDER 11,990'S PROCEDURAL REQUIREMENTS VIOLATES NEPA**

285.     Paragraphs 1- 210 are incorporated as if fully set forth herein.

286.    Executive Order 11990 requires each federal agency to "take action to minimize the destruction, loss or degradation of wetlands, and to preserve and enhance the natural and beneficial values of wetlands in carrying out the agency's responsibilities." Exec. Order No. 11,990(1)(a).

287.    For projects subject to NEPA, Executive Order 11990 mandates that the agency "shall avoid undertaking or providing assistance for new construction located in wetlands unless the head of the agency finds (1) that there is no practicable alternative to such construction, and (2) that the proposed action includes all practicable measures to minimize harm to wetlands." Exec. Order No. 11,990(2)(a); 23 C.F.R. § 777.3.

288.    Executive Order 11990 requires the agency to make a finding that "there is no practicable alternative" before it makes a decision to proceed with a project that would destroy wetlands. Exec. Order No. 11,990(2)(a); 23 C.F.R. § 777.3.

289.    In order to make a finding that there are no practicable alternatives, an agency must examine alternatives to the proposed action.

290.    The Bayfront Parkway Project as proposed will involve "permanent wetland fill in order to construct [the roundabout at the] Holland street intersection." Cat. Ex. at 73

291.    There is no evidence in the record that PennDOT completed an alternatives analysis for the Holland Street intersection to demonstrate that there are no practicable alternatives that do not involve filling in wetlands.

292.    PennDOT's assertion in the Categorical Exclusion application that "there are no practicable alternatives to construction within the wetlands" was not supported with evidence provided to the Federal Highway Administration and made part of the Categorical Exclusion Evaluation Cat. Ex. at 73.

293.     There are practicable alternatives to the proposed Bayfront Parkway Project that do not involve permanently filling in wetlands at the Holland Street intersection.

294.     PennDOT's failure to comply with Executive Order 11,990 and the Federal Highway Administration's approval of a Categorical Exclusion without PennDOT completing an alternatives analysis violates Executive Order 11,990, NEPA, and Federal Highway regulations, and therefore is contrary to law.

## SIXTH CLAIM

### PENNDOT'S SELECTED DESIGN FOR THE BAYFRONT PARKWAY PROJECT IS ARBITRARY AND CAPRICIOUS BECAUSE IT DOES NOT ACCOMPLISH THE PROJECT'S PURPOSE.

295.     Paragraphs 1- 210 are incorporated as if fully set forth herein.

296.     The stated purpose of the Bayfront Parkway Project is "to improve the pedestrian, bicycle, transit, and passenger vehicle connection of the Erie Central Business District and adjacent neighborhoods to the waterfront property north of the Bayfront Parkway." Cat. Ex. at 7.

297.     The Bayfront Parkway Project increases barriers for pedestrians and bicyclists that the design was supposed to eliminate and instead further divides the Bayfront from Downtown Erie and adjacent neighborhoods.

298.     PennDOT has failed to include evidence in the Categorical Exclusion documentation demonstrating that the proposed Bayfront Parkway Project design will actually improve pedestrian or cyclist connections across the Bayfront Parkway.

299.     Pedestrian bridges and roundabouts decrease pedestrian and cyclist access and connection compared to at-grade signalized intersection crossings.

300.     PennDOT's selection and the Federal Highway Administration's approval of a project that does not meet its stated objective is arbitrary and capricious.

## SEVENTH CLAIM

## PENNDOT'S FAILURE TO COMPLETE AN ENVIRONMENTAL ASSESSMENT WAS ARBITRARY AND CAPRICIOUS, OR OTHER OTHERWISE NOT IN ACCORDANCE WITH LAW

301.     Paragraphs 1- 210 are incorporated as if fully set forth herein.

302.     NEPA requires an environmental for "[a]ctions for which the Administration has not clearly established the significance of the environmental impact." 23 C.F.R. § 771.115(c).

303.     Under NEPA, agency must prepare an environmental assessment "for each action that is not a [categorical exclusion] and does not clearly require the preparation of" an environmental impact statement. 23 C.F.R. § 771.119(a)(1).

304.     In 2018, the Federal Highway Administration and PennDOT determined that the project should be classified as an action in need of an environmental assessment. At that time, PennDOT and the Federal Highway Administration had not clearly established the significance of the environmental impacts and agreed on the need for further study of alternatives and the need extensive public involvement.

305.      Preparation of an environmental assessment requires the agency to "identify alternatives and measures that might mitigate adverse environmental impacts." 23 C.F.R. § 771.119(b).

306.     Despite acknowledging during its scoping meeting that an environmental assessment was the appropriate review process for the project, PennDOT failed to comply with the required procedures, including its obligation to consider significant environmental impacts, alternatives, and a public hearing.

307.     The Bayfront Parkway Project does not qualify for a categorical exclusion.

308.     Because the Bayfront Parkway Project is ineligible for a categorical exclusion,

PennDOT should have prepared an environmental assessment and either a Finding of No

Significant Impact or an Environmental Impact Statement.

309.     The Federal Highway Administration's approval of a categorical exclusion for the

Bayfront Parkway Project is arbitrary and capricious, violates NEPA and is therefore contrary to

law.

### EIGHTH CLAIM

**FEDERAL HIGHWAY ADMINSITRATION'S PRE-APPROVAL OF A CATEGORICAL EXCLUSION FOR THE BAYFRONT PARKWAY WAS ARBITRARY AND CAPRICIOUS AND VIOLATES NEPA**

310.     Paragraphs 1- 210 are incorporated as if fully set forth herein.

311.     The Federal Highway Administration properly determined that the Bayfront Parkway

Project required an environmental assessment.

312.     The Federal Highway Administration's determination on April 15, 2020 "that the

project, as proposed, would not result in either individual or cumulative significant impacts" is

arbitrary and capricious. Cat. Ex. at 40–41.

313.      PennDOT did not submit the Categorical Exclusion Evaluation, containing documents

supporting its request for a categorical exclusion, to the Federal Highway Administration for

approval until June 9, 2020.

314.     Therefore, the Federal Highway Administration illegally pre-approved the categorical

exclusion for the Bayfront Parkway Project. The Federal Highway Administration's April 15,

2020 decision to allow PennDOT to avoid an alternatives analysis or a public comment period in

its NEPA compliance was not based on evidence before the Federal Highway Administration.

315.     The Federal Highway Administration did not make a determination that the Bayfront Parkway Project falls within a "category of actions which do not individually or cumulatively have a significant effect on the human environment" and, based on the Federal Highway Administration's "past experience with similar actions," do not involve significant impacts. 40 C.F.R. § 1508.4; 23 C.F.R. § 771.117(a).

316.     The Federal Highway Administration failed to consider whether the Bayfront Parkway Project is excluded from consideration as a categorical exclusion based on factors listed in Federal Highway Administration's categorical exclusion regulations at 23 C.F.R. § 771.117(a).

317.      A categorical exclusion may not be used for the Bayfront Parkway Project because it meets two factors in 23 C.F.R. § 771.117(a); it induces significant impacts to planned growth and has significant impacts on travel patterns.

318.     The Federal Highway Administration's approval of a categorical exclusion for the Bayfront Parkway Project before it had the Categorical Exclusion Evaluation document from PennDOT and despite the Bayfront Parkway Project being excluded from consideration as a categorical exclusion based on Federal Highway Administration's own regulations renders the categorical exclusion decision arbitrary and capricious and contrary to NEPA and the Administrative Procedure Act.

## NINTH CLAIM

### PENNDOT VIOLATED THE FEDERAL AID HIGHWAY ACT AND NEPA BY FAILING TO COMPLY WITH PUBLIC HEARING REQUIREMENTS

319.     Paragraphs 1- 210 are incorporated as if fully set forth herein.

320.     The Federal Aid Highway Act requires that "[a]ny State transportation department which submits plans for a Federal-aid highway project involving the… going through, [of] any

city … certify to the Secretary that it has had public hearings, or has afforded the opportunity for such hearings." 23 U.S.C. § 128(a).

321.     Federal Highway Administration regulations implementing Federal Highway Act requirements mandate that "state public involvement/public hearing procedures must provide for:… [o]ne or more public hearings or the opportunity for hearing(s)… for any Federal-aid project that … changes the layout or functions of connecting roadways." 23 C.F.R. § 771.111(h)(2)(iii).

322.     To demonstrate compliance with these requirements, Federal Highway Administration regulations require a state agency to "submi[t] to the [Administration] a transcript of each public hearing and a certification that a required hearing or hearing opportunity was offered." 23 C.F.R. § 771.111(h)(2)(vi).

323.     The Bayfront Parkway Project runs through the City of Erie and will change the layout of three intersections between the parkway and city streets.

324.     The Federal Aid Highway Act and Federal Highway Administration implementing regulations mandate that PennDOT hold a public hearing or provide an opportunity for a public hearing on the Bayfront Parkway Project and to submit a transcript of that hearing and a certification that the hearing or opportunity was offered.

325.     PennDOT failed to hold a hearing or provide an opportunity for a public hearing on the Bayfront Parkway Project.

326.     PennDOT's failure to host a hearing, provide a transcript, or certify to the Administration that it held the hearing violates the Federal Aid Highway Act and its regulations.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs pray this Court:

A.    Enter a declaratory judgment finding that the Defendants have violated NEPA;

B.    Enter a declaratory judgment finding that the Defendants have violated Federal Aid Highway Act;

C.    Enjoin any federal funding for the Bayfront Parkway Project pending Defendants' compliance with NEPA and the Federal Aid Highway Act

D.    Remand the matter to PennDOT and the Federal Highway Administration for further consideration under NEPA and the Federal Aid Highway Act in accordance with this Court's judgment;

E.    Award Plaintiffs costs of this action, including reasonable attorney fees; and

F.    Grant such further and other relief as this Court may deem just and proper.

Respectfully submitted this 15th day of December, 2020.

*s/ Jill Witkowski Heaps*
Jill Witkowski Heaps*
Earthjustice
48 Wall Street, 15th Floor
New York, NY 10005
Tel: (212)-845-7392
jheaps@earthjustice.org
NY 4145405

*s/ Sophia Jayanty*
Sophia Jayanty*
Earthjustice
48 Wall Street, 15th Floor
New York, NY 10005
Tel: (212)-845-8035
sjayanty@earthjustice.org
NY 5570056

*s/ Courtney Bowie*
Courtney Bowie*
Earthjustice
48 Wall Street, 15th Floor
New York, NY 10005
Tel: (212)-845-8038
cbowie@earthjustice.org
MS 102528


*s/ Abigail M. Jones*
Abigail M. Jones
Citizens for Pennsylvania's Future
425 Carlton Road, Suite 1
Mt. Pocono, PA 18344
Tel: (570) 216-3313
jones@pennfuture.org
PA 323921

Counsel for Plaintiffs

*- pro hac vice* motion forthcoming