**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| THE NATIONAL ASSOCIATION FOR | ) | |
| THE ADVANCEMENT OF COLORED | ) | |
| PEOPLE ERIE UNIT 2262, et al., | ) | **C.A. No. 20-362 Erie** |
| **Plaintiffs** | ) | |
| | ) | |
| v. | ) | **District Judge Susan Paradise Baxter** |
| | ) | |
| FEDERAL HIGHWAY | ) | |
| ADMINISTRATION, et al., | ) | |
| **Defendants.** | ) | |

**MEMORANDUM OPINION**

**I.**   **INTRODUCTION**

   **A.**   **Relevant Factual Background**

   The Bayfront Parkway (State Road 4034) is a state highway running east to west at the

northern edge of the City of Erie, Pennsylvania, dividing Lake Erie's Bayfront on the north from

the Erie's downtown district on the south. The Bayfront is home to several amenities, including a

public library, a Greyhound bus terminal, several public parks, a miniature golf course, the Erie

Maritime Museum, a pier, the Presque Isle Yacht Club, several hotels, restaurants, the Bayfront

Convention Center, several marinas, and pedestrian/cyclist pathways. All of these amenities are

located on the north side of the Bayfront Parkway. As a result, the Bayfront Parkway is one of

several barriers between the City and its waterfront that makes it difficult for the City's residents

on the south to access the Bayfront's amenities safely. Other barriers include high bluffs on the

south side of the Parkway, at both the Sassafras Street Extension and Holland Street

intersections, and CSX railroad tracks located between the two intersections.

1

In June 2017, the Pennsylvania Department of Transportation ("PennDOT") completed a Bayfront Parkway Feasibility Study (the "Study") that focused on evaluating and providing conceptual improvements to the Parkway to: encourage more efficient and safe access to motorized vehicles; support pedestrian, bike and transit access to the Bayfront; enhance connections to downtown Erie and its neighborhoods; and support current and future development within the downtown and Bayfront areas (AR-1, at 8).[1] Among other things, the Study included a public survey that revealed that a majority of respondents did not feel safe walking or biking across the Bayfront Parkway (AR-3, at 9).

As a result of the Study, PennDOT initiated the Bayfront Parkway Corridor Improvement Project ("Bayfront Parkway Project," or "the Project"). The stated purpose of the Project is "to improve the pedestrian, bicycle, transit, and passenger vehicle connection of the Erie Central Business District and adjacent neighborhoods to the waterfront property north of the Bayfront Parkway (SR 4034), to improve future congestion to an acceptable level of service or delay, and to improve traffic operations and efficiency" (AR-11, at 13).

On February 22, 2018, PennDOT held a scoping field view meeting for the Bayfront Parkway Project, which was attended by a representative of the Federal Highway Administration ("FHWA"), among others. At this meeting, PennDOT and the FHWA determined that the Project should proceed as an Environmental Assessment based on the alternatives under consideration at the time (AR-19, at 41).

---

[1]

The administrative record in this case was submitted by the Federal Highway Administration on August 19, 2021 [ECF No. 41] and will be referenced herein as "AR-" followed by the designated document number and the relevant page number(s) within the document, where applicable. All citations to the record refer to documents, or statements within documents, that are not disputed by the parties, as indicated in the parties' statements of undisputed material facts [ECF Nos. 103, 106, 109] and responses thereto [ECF Nos. 112, 114, 116].

On February 26, 2020, the FHWA formally approved PennDOT's scope for the Project as an Environmental Assessment (AR-11, at 3). The proposed project consisted of reconfiguring a one-half mile segment of the Bayfront Parkway at the three major downtown intersections at Sassafras Street Extension, State Street, and Holland Street, and completing a multiuse trail connecting all three intersections on the north side of the Bayfront Parkway to enhance pedestrian and bicycle access. In particular, the proposed project included modifying the Sassafras Street intersection to a dual lane three-leg roundabout; modifying the State Street intersection to a grade-separated signalized intersection with a new structure to carry State Street over the Parkway with interior ramps along the Parkway and an outside lane allowing through-traffic to pass beneath State Street; and modifying the Holland Street intersection to a dual lane four-leg roundabout. In addition, sidewalks, crosswalks, and a pedestrian bridge were also proposed to connect the residential neighborhood and downtown Erie to the waterfront (AR-11, at 5).

On March 31, 2020, PennDOT formally requested that the Project be "downscoped," or reclassified, from an Environmental Assessment to a categorical exclusion under applicable environmental regulations (AR-13, at 2-6). The "downscoping" request stated, *inter alia*, that the Project would provide for a pedestrian bridge at Holland Street and would accommodate the construction of overhead pedestrian bridges crossing the Bayfront Parkway at both the Sassafras Street Extension and State Street intersections. (AR-13, at 5). On April 15, 2020, the FHWA approved PennDOT's request to downscope the Project to a categorical exclusion, acknowledging that "PennDOT has conducted extensive public involvement with a variety of stakeholders, which has resulted in no substantial controversy" and concluding that "the Project,

as proposed, would not result in either individual or cumulative significant [environmental] impacts" (AR-19, at 41-42).

On April 29, 2020, PennDOT wrote and published a press release entitled "PennDOT Announces Preferred Alternatives for the Bayfront Parkway Central Corridor Improvement Project, Erie County" and invited public comment through its website (AR-51, at 324-25). The press release stated that the preferred alternative for the Project would include "[o]verhead pedestrian bridges at each intersection" (AR-51, at 324). In response to the press release, numerous written comments were received from the public, including those expressing concerns that the Project would increase vehicle traffic, would not improve pedestrian access to the waterfront, would not do enough to relieve congestion, would slow traffic through the addition of roundabouts, and would amount to unnecessary government spending (AR-24, at 58-61). In addition, concerns were expressed regarding the lack of a full environmental assessment (Id.).

On June 4, 2020, Citizens for Pennsylvania's Future ("PennFuture") submitted a letter to PennDOT objecting to the downscoping of the Project to a categorical exclusion and requesting that an environmental assessment be prepared for the Project and that a public hearing be held (AR-52, at 507-509). On June 9, 2020, PennDOT submitted its Categorical Exclusion Evaluation ("CEE") package to the FHWA (AR-19, at 4). On June 15, 2020, the FHWA formally approved PennDOT's request for "Level 2 Categorical Exclusion in accordance with 23 CFR 771.117(d), Item Number Other" for the Bayfront Parkway Project (AR-19, at 364). Thereafter, on June 22, 2020, PennDOT wrote a letter to PennFuture responding to each of the concerns raised in PennFuture's letter of June 4, 2020, and informing it that the CEE was approved by the FHWA on June 15, 2020, and that a copy could be found on the Project website (AR-52, at 536-37).

4

### B.      The Instant Lawsuit

On December 15, 2020, Plaintiffs National Association for the Advancement of Colored People Erie Unit 2262 ("NAACP") and PennFuture filed a complaint against Defendants FHWA and PennDOT, challenging the FHWA's approval of a categorical exclusion for the Bayfront Parkway Project. In particular, Plaintiffs assert nine claims alleging that the FHWA's approval of the categorical exclusion was arbitrary and capricious, in violation of the Administrative Procedures Act, 5 U.S.C. §§ 701, *et seq.* ("APA"), the National Environmental Policy Act, 42 U.S.C. §§ 4321, *et seq.* ("NEPA"), the Federal-Aid Highway Act, 23 U.S.C. §§ 101, *et seq.*, and two executive orders. In addition, Plaintiffs allege that PennDOT failed to hold a public hearing regarding the Bayfront Parkway Project in violation of the Federal-Aid Highway Act. As relief for their claims, Plaintiffs request declaratory and injunctive relief that would effectively stay all federal funding for the Project and remand the matter to Defendants for further consideration consistent with NEPA and the Federal-Aid Highway Act.

Presently pending before the Court are cross-motions for summary judgment that were filed by the parties on October 14, 2022 [ECF Nos. 101, 104, 107]. The motions have been fully briefed and are now ripe for disposition.

### C.      Legal Framework for FHWA's Decision

NEPA requires federal agencies to comply with certain procedural requirements when undertaking any major action. 42 U.S.C. §4332. In particular, NEPA mandates that agencies take a "hard look" at the environmental consequences of their proposed actions. Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 350 (1989); Twp. of Bordentown v. Fed. Energy Regulatory Comm'n, 903 F.3d 234, 248 (3d Cir. 2018). "NEPA itself does not mandate particular results, but simply prescribes the necessary process." Id. at 350.

For an action that "significantly affect[s] the quality of the human environment," an agency must prepare an Environmental Impact Statement ("EIS"), and if the agency is uncertain about the effect a proposed action will have, the agency must prepare an environmental assessment ("EA") to determine whether an EIS is needed. 42 U.S.C. § 4332(C); 40 C.F.R. § 1508.9(a)(1). However, "Under NEPA, an EIS or EA is not required unless the contemplated action will affect the environment 'in a significant manner or to a significant extent,' with significance defined in terms of both context and intensity." Cty. of Seneca v. Cheney, 12 F.3d 8, 12 (2d Cir. 1993), quoting Marsh v. Oregon Nat, Res. Council, 490 U.S. 360, 374 & n.20 (1989). In some cases, an abbreviated EA will suffice. 40 C.F.R. § 1508.9. In other cases, an action may be entirely excluded from environmental review. Such an exception is called a "categorical exclusion" or CE.

The FHWA's procedures for categorical exclusions are found at 23 C.F.R. § 771.117. In general, actions qualify for a categorical exclusion if they

> meet the definition contained in 40 C.F.R. § 1508.4,[2] and, based on FHWA's past experience with similar actions, do not involve significant environmental impacts. They are actions that: Do not induce significant impact to planned growth or land use for the area; do not require the relocation of significant numbers of people; do not have a significant impact on any natural, cultural, recreational, historic or other resource; do not involve significant air, noise, or water quality impacts; do not have significant impacts on travel patterns; or do not otherwise, either individually or cumulatively have any significant environmental impacts.

23 C.F.R. § 771.117(a).

---

2

40 C.F.R. § 1508.4 provides an exception to the EIS requirement for "actions which do not individually or cumulatively have a significant effect on the human environment and which have been found to have no such effect in procedures adopted by a Federal agency in implementation of these regulations...." (internal citation omitted).

The FHWA's regulations identify two levels of categorical exclusions for purposes of processing. "Level 1 CEs" are specific actions listed in 23 C.F.R. § 771.117(c) that qualify as a CE without further documentation or review from the FHWA. Actions not included in the list of Level 1 CEs may still qualify as a CE under Section 771.117(d). These actions are generally known as "Level 2 CEs," or "documented CEs." Level 2 CEs require FHWA approval and must be supported by documentation demonstrating that the specific conditions or criteria of 40 C.F.R. § 1508.4 and 23 C.F.R. § 771.117(a) are satisfied, and that significant environmental effects will not result. 23 C.F.R. § 771.117(d). Although the regulations provide specific examples of Level 2 CEs, the list is not intended to be exclusive. Aquifer Guardians in Urban Areas v. FHWA, 779 F.Supp.2d 542 (W.D. Tex. 2011).

As noted earlier, the FHWA approved the Bayfront Parkway Project as a Level 2 CE.

**D.      Standard of Review**

The FHWA's approval of a categorical exclusion for the Bayfront Parkway Project is a final agency action under NEPA that is subject to judicial review under the APA. Under the APA, a court may set aside an agency action only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). An agency's decision is arbitrary under this standard only if the agency relied on improper factors, entirely failed to consider critical aspects of the problem, offered a rationale that contradicts the facts before it, or reached a decision "so implausible that it could not be ascribed to a difference in view or the product of agency expertise." CBS Corp. v. F.C.C., 663 F.3d 122, 137 (3d Cir. 2011) (citation omitted). An agency decision is not arbitrary and capricious when the agency examined the pertinent data and has a rational connection between the data and its decision. Id.

7

"The scope of review under the APA's 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co., 463 U.S. 29, 43 (1983). So, in reviewing an agency decision under the APA, the "function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." Occidental Engineering Co. v. I.N.S., 753 F.2d 766, 769 (9th Cir. 1985). "This is a 'deferential standard' that 'presume[s] the validity of agency action.'" SBS, Inc. v. F.C.C., 414 F.3d 486, 496 (3d Cir. 2005), quoting Sw. Bell Tel. Co v. F.C.C., 168 F.3d 1344, 1352 (D.C. Cir. 1999). "Deference is particularly appropriate where [as here] an agency is interpreting its own regulations in applying a categorical exclusion." City of Alexandria, Va. v. Fed. Highway Admin., 756 F.2d 1014, 1020 (4th Cir. 1985). If, after reviewing the decision in light of the relevant record, the court determines that the decision was "truly informed," the decision is entitled to deference. Citizens Advisory Comm. On Priv. Prisons, Inc. v. U.S. Dep't of Justice, 197 F.Supp.2d 226, 240 (W.D. Pa. 2001), aff'd 33 Fed. Appx. 36 (3d Cir. 2002) (citations omitted). Reversal is inappropriate "unless the evidence not only supports a contrary conclusion, but compels it." Yitang Sheng v. Att'y Gen. of U.S., 365 Fed. Appx. 408, 410 (3d Cir. 2010), quoting Abdille v. Ashcroft, 242 F.3d 477, 483-84 (3d Cir. 2001).

## II.  DISCUSSION

### A.  Propriety of FHWA's Approval of Categorical Exclusion

Plaintiffs contend that the FHWA's approval of a categorical exclusion for the Bayfront Parkway Project was arbitrary and capricious because, they argue, the record does not contain documentation satisfying the "specific conditions or criteria" that the Project: (1) does "not induce significant impacts to planned growth or land use for the area;" (2) does "not have

8

significant impacts on travel patterns;" (3) does "not involve significant air, noise, or water quality impacts;" and (4) does "not otherwise, either individually or cumulatively, have any significant environmental impacts." (ECF No. 105, at p. 12, <u>citing</u> 23 C.F.R. § 771.117(a), (d)). In addition, Plaintiffs argue that the Project involves "substantial controversy on environmental grounds" and, thus, a categorical exclusion cannot be approved without additional environmental studies, even if the Project would usually be eligible. (<u>Id</u>., <u>citing</u> 23 C.F.R. 771.117(b)(2)). Each of these points of contention will be addressed, in turn.[3]

**1.    Impacts to Planned Growth or Land Use**

Plaintiffs note that the CEE specifically affirms that the Project *will* "induce impacts (positive and negative) on planned growth, land use, or development patterns for the area…" (AR-19, at 341); yet, according to Plaintiffs, the record "contains no analysis of whether those impacts are significant as required by 23 C.F.R. § 771.117(a)." (ECF No. 105, at p. 13). The record shows otherwise.

Indeed, the record contains extensive investigation and background documentation supporting the Defendants' determination that the Project will not have a significant impact on planned growth or land use. This documentation includes in-depth reports finding that the Project will have no potential adverse impacts to existing historical structures (AR-7); threatened and endangered species (AR-19, at 84-85); or aquatic, agricultural, and cultural resources (AR-19, at 72-76, 79-83, 99-101). Based on these reports, the CEE concludes that "[n]o long-term impacts to surrounding land uses, or socioeconomic displacements/impacts will result from the project

---

3
Each of the points raised by Plaintiffs is countered by Defendants in both their opposition briefs [ECF Nos. 113, 115] and their briefs in support of their cross-motions for summary judgment [ECF Nos. 102, 108], which argue that the record supports the FHWA's finding that the project meets the requirements of a CE.

activity" (AR-19, at 341). Moreover, the CEE explains that the Project "is designed to incorporate future development and connectivity to the Erie Bayfront" and is, thus, consistent with planned and existing growth stemming from a shift in the Bayfront "from an industrial harbor to a place-oriented waterfront with recreational, community, tourist/museum and residential uses" (AR-19, at 341). Thus, no secondary growth will be induced by the Project (Id.). In other words, as the FHWA notes, "the construction of the Project is not driving development," but is accommodating it. (ECF No. 115, at p. 9).

Based on the foregoing, the Court finds that the FHWA's finding that the Project does "not induce significant impacts to planned growth or land use for the area" is adequately supported by the administrative record.

## 2.    Impact on Travel Patterns

Plaintiffs assert that "[n]owhere in the Categorical Exclusion Evaluation – or elsewhere in the record – does PennDOT evaluate whether the Project will "have significant impact on travel patterns," which renders the FHWA's approval of a CE for the Project arbitrary and capricious (ECF No. 105, at p. 13). This argument is unfounded.

The CEE makes clear that the Project's proposed roadway will maintain the Bayfront Parkway's current alignment, largely within the existing right-of-way, and requires partial acquisitions from only 12 adjacent parcels with no relocation of people, businesses, or farms (AR-19, at 11-14, 343). The changes to the three intersections will create no new connections between any existing roadways, and no existing connections will be eliminated; thus, the same origination and destination points will remain available for motorists entering and leaving the intersections (AR-19, at 11-14, 54-59). Instead, the stated purpose of the Project includes

reducing crashes, easing existing and future traffic congestion, and improving traffic operations

and efficiency (AR-19, at 8). As the District Court of Vermont recently explained,

> A significant impact on travel patterns as the phrase appears in 23 CFR
> § 711.117(a) is not synonymous with improving the flow of traffic. If it
> were, Section 711.117(a) would disqualify most highway improvement
> projects from CE status. These projects – great and small – are commonly
> intended to ease congestion and reduce delays. This is the nature of
> highway work. An improvement in traffic flow does not automatically
> disqualify a project from consideration as a CE.

R.L. Vallee, Inc. v. Vermont Agency of Transportation, 2020 WL 4689788, at *8 (D.Vt.

July 8, 2020). See also City of Alexandria v. FHWA, 756 F.2d 1014, 1016 (4th Cir. 1985

(upholding CE for project "designed to reduce congestion and travel times" on congested

roadway in major urban area); Aquifer Guardians in Urban Areas v. FHWA, 779

F.Supp.2d 542, 570 (W.D. Tex. 2011) (upholding CE for highway project designed to

ease congestion without adding any new through-lanes); Aquifer Guardians in Urban

Areas v. FHWA, 779 F.Supp.2d 542 (W.D. Tex. 2011); Public Interest Research Group

v. FHWA, 884 F. Supp. 876, 882 (D.N.J. 1995) (upholding CE for construction of new

HOV lanes that would reduce congestion and travel time); Ware v. FHWA, 2006 WL

696551, at *1 (S.D. Tex. Mar. 15, 2006) (upholding CE for variety of road improvements

designed to alleviate "severe traffic congestion" on interstate near Houston, Texas).

As with the construction projects reviewed in the foregoing cases, the Project at issue in

this case is also designed to improve traffic flow without the construction of any new through-

lanes that would add capacity across the Parkway. Instead, the Project involves only the

modification of existing city intersections, while maintaining their current alignments. As such,

the Project is markedly different from other highway projects that courts have found to induce

significant impacts on travel patterns. See, e.g., West v. Sec'y of Dep't of Transp., 2-6 F,3d 920,

929 (9th Cir. 2000) (rejecting the use of a CE for an interchange project that involved construction of an "entirely new … four-lane, fully-directional interchange"); <u>R.B. Jai Alai v. Sec'y of Fla. Dep't of Transp.</u>, 112 F.Supp.3d 1301, 1308-09 (D. Fla. 2015) (rejecting CE for project involving construction of a new interchange, described as a "four-lane, 112-foot-wide, three-span elevated overpass," including "nine lanes of frontage roads").

Based on the foregoing, the Court finds that the FHWA's conclusion that the Project will not induce significant impacts on travel patterns was rationally based on, and supported by, the record.

### 3. Impact on Water Resources

Plaintiffs contend that PennDOT "failed to assess potentially significant impacts to water quality, namely related to stormwater runoff and wetlands…" (ECF No. 105, at p. 14). This contention is belied by the record.

### a. Stormwater

Regarding stormwater runoff, Plaintiffs argue that "PennDOT did not identify Mill Creek as an aquatic resource present in the project area, let alone examine the impact of stormwater from the Project – either during construction or after the expansion – on Mill Creek and Presque Isle Bay" (<u>Id.</u>). However, the record contains an extensive Wetland and Stream Identification and Delineation Report that was prepared by PennDOT's consultants in December 2019, based on a field investigation that was conducted in October 2019 (AR-10). Based on this investigation, PennDOT determined that there are no streams, rivers, water sources, or navigable waterways within the Project area (AR-10, at 6; AR-19, at 72). This would include the absence of both Presque Isle Bay and Mill Creek from the affected area. In addition, the record contains a Phase 1A Historic Structures Reconnaissance Survey that was conducted in August 2019, which states

that "the Mill Creek tube is a deeply-buried drainage structure which is not visible within the [Project's area of potential effect]" and, thus, "no project impacts are anticipated" (AR-7, at 3). In light of this finding, Plaintiffs' concern regarding potential contamination of the Mill Creek tube is largely speculative and has no basis in the record.

Finally, while the CEE acknowledges that "[m]inor effects on groundwater might occur," it notes that "there are no significant groundwater aquifers or water supplies used for human consumption in the project area" (AR-19, at 73). Nonetheless, the CEE contains PennDOT's representation that the Project will include a post-construction stormwater management ("PCSM") plan designed "to minimize impervious areas and maximize the protection of existing drainage features and existing vegetation" (AR-19, at 73). In fact, the preparation of a PCSM plan for the Project is mandated by the National Pollutant Discharge Elimination System ("NPDES") permit PennDOT was required to obtain for discharges of stormwater associated with construction activity.[4] A PCSM plan must include an analysis demonstrating that the PCSM best management practices either will meet the volume, water quality, and rate requirements specified in the applicable approved watershed stormwater management plan, or will manage the net change in volume, water quality, and peak rate for storm events in a manner that does not exceed the preconstruction rates. 25 Pa. Code 102.8(g)(2) and (3). Both options are designed to ensure that the construction activity will not have a significant impact on stormwater discharge.

Significantly, the fact that the PCSM was not part of the administrative record considered by the FHWA does not mean that the FHWA's approval of the CEE was arbitrary and

---

[4] The Court takes judicial notice of the fact that PennDOT was issued a NPDES permit for the Project on June 28, 2022, after the FHWA approved the CEE. Notice of the permit was published in the *Pennsylvania Bulletin* on July 30, 2022. 52 Pa. B. 4294

capricious. Indeed, courts have determined that it is proper for agencies to approve projects "even though conditioned on further development of mitigation measures." See Bergen County v. Dole, 620 F.Supp. 1009, 1061 (D.N.J. 1985), citing Springfield Twp. v. Lewis, 712 F.2d 426, 451 (3d Cir. 1983). "General commitments to future action suffice to meet mitigation requirements" under NEPA. Id., citing Nat'l Wildlife Federation v. Lewis, 519 F.Supp.523 (1981), aff'd 677 F.2d 259 (2d Cir. 1982). Thus, PennDOT's stated commitment to prepare and submit a PCSM plan after NEPA review was appropriately considered as part of FHWA's administrative review and approval of a CE for the Bayfront Parkway Project (ECF No. 108, at pp. 21-23).

### b.   Wetlands

As for the impact on wetlands, Plaintiffs note that the CEE acknowledges that the Project will involve "[p]ermanent [w]etland fill in order to construct [the roundabout at the] Holland [S]treet intersection," while the current configuration of the same intersection (the "no-build alternative") does not involve the filling of wetlands (ECF No. 105, at p. 15; AR-19, at 74). Thus, Plaintiffs contend that the Project violates Executive Order 11990,[5] which, they argue, requires federal agencies to choose the alternative that would not destroy wetlands, unless it demonstrates that such alternative was not practicable (Id.).

---

5

Executive Order 11990 requires each federal agency to "take action to minimize the destruction, loss, or degradation of wetlands, and to preserve and enhance the natural and beneficial values of wetlands in carrying out the agency's responsibilities." E.O. 11990, Protection of Wetlands, 42 Fed. Reg. 26,961 (May 24, 1977). Thus, agencies are directed to "avoid undertaking or providing assistance for new construction located in wetlands" unless the agency finds that "there is no practicable alternative to such construction" and that "the proposed action includes all practicable measures to minimize harm to wetlands which may result from such use." Id.

Although "Executive Order 11990 sets forth a more exacting standard for agency action than NEPA …, the Court still reviews agency action under the arbitrary and capricious standard of the Administrative Procedure Act." Surfrider Found v. Dalton, 989 F.Supp. 1309, 1330 (S.D. Cal. 1998), citing National Wildlife Federation v. Adams, 629 F.2d 587, 592 (9th Cir. 1980). In this context, "[a]gencies are not required to prepare a separate document that explicitly illustrates compliance with 11990, so long as the project's consistency with the Executive Order can be reasonably inferred from the record." Id.; see also Sierra Club v. Hassell, 636 F.2d 1095, 1100 (5th Cir. Unit B 1981) ("Because the agencies concluded the project had no significant impacts on wetlands … written findings were not required").

In this case, the record indicates that PennDOT fully evaluated the effect of the Project on wetlands, as evidenced by the Wetland and Stream Identification and Delineation Report that was prepared in December 2019 (AR-10). The Report identified eight wetlands in the study area covering a total of 1.178 acres (Id., at 5-6) ; yet the Project will impact only two wetlands covering a total of only 0.015 acres (AR-19, at 74).[6] The CE also states that protective fencing will be placed around other wetland areas to protect against accidental encroachment during construction (AR-19, at 74). These precautions, along with the *de minimis* wetlands area directly impacted by the Project, are consistent with the Executive Order's mandate to "minimize the destruction, loss, or degradation of wetlands." E.O. 11990, §1(a).

Moreover, the E.O. 11990 expressly permits consideration of economic, environmental and "other pertinent factors" in determining the most practicable alternative. Id, §2(a). Although Plaintiffs correctly note that the current configuration of the Holland Street intersection with the

---

6

According to PennDOT's internal guidance, any impact to wetlands less than 0.05 acres is considered *de minimis* and does not require mitigation (AR-39, at 13, 58).

Bayfront Parkway has no impact on wetlands, PennDOT determined that the current design is not a practicable alternative to the Project alternative because it does not accomplish the Project purposes of improving pedestrian, bicycle, and passenger vehicle connection, improving future congestion, or improving traffic conditions (AR-19, at 8-9, 43). Such a finding is consistent with the Executive Order's mandate. See City of Dania Beach v. F.A.A., 628 F.3d 581, 591 (D.C. Cir. 2010) (determining that even if another alternative would cause no impacts to wetlands, the agency's decision not to choose it was not arbitrary and capricious where the alternative had other negative effects); Adams, 629 F.2d at 592 (finding that an alternative is practicable under E.O. 11990 only if "it is capable of attainment within relevant, existing constraints"); Partners in Forestry Co-op v. U.S. Forest Serv., 45 F.Supp.3d 677, 688-89 (W.D. Mich. 2014) ("NEPA does not require an agency to pursue alternatives that 'present unique problems, or are impractical or infeasible'") (citation omitted).

Because PennDOT fully evaluated the impact to wetlands and chose an alternative with *de minimis* impacts (AR-19, at 74), its determination that there was "no practicable alternative" to the Project's  Holland Street alternative was consistent with E.O. 11990, and the FHWA's approval of a CE for the Project in light of such determination was not arbitrary and capricious.

### 4.    Significant Environmental Impacts

Plaintiffs challenge the FHWA's conclusion that "the project, as proposed, would not result in either individual or cumulative impacts" on the environment (AR-19, at 41-42), arguing that (i) NEPA regulations require "documentation that a project will not have cumulative environmental impacts before a categorical exclusion can be granted," and (ii) PennDOT "failed to examine a number of [individual] potentially significant impacts to and from climate change,

and to the environmental justice community within the project area." (ECF No. 105, at pp. 16-17). These arguments will be addressed in turn.

### a.    Cumulative Impacts

Plaintiffs contend that the CEE "does not include any cumulative environmental impacts analysis even though it is required under NEPA," thus rendering the FHWA's approval of the CE arbitrary and capricious. (ECF No. 105, at p. 16, citing 23 C.F.R. § 771.117(a), (d)).[7] However, as PennDOT correctly notes, neither regulatory provision cited by Plaintiffs requires preparation of a separate cumulative impacts analysis. Indeed, "[t]rying to include all cumulative effects of every project when analyzing any project is not feasible." Highway J. Citizens Group v. U.S. Dept. of Transportation, 891 F.3d 697, 700 (7th Cir. 2018) "[A]lthough cumulative effects matter, the agency has discretion to consider when and how they are considered. Id., citing, Kleppe v. Sierra Club, 427 U.S. 390, 409-15 (1976).

In this case, it is clear from the record that PennDOT's finding of no significant cumulative environmental effects (AR-19, at 41), and the FHWA's stated agreement with the same (Id., at 2), were far from conclusory statements, as Plaintiffs assert. To the contrary, the CEE, as a whole, supports the finding. As noted previously, the CEE indicates that the Project will be constructed within the Bayfront Parkway's existing corridor, with partial acquisitions needed from only twelve adjacent parcels, and will not require the relocation of any people, businesses, or farms (Id., at 341, 343); there are no affected surface waters within the Project

---

7

Under NEPA, "cumulative impacts" are defined as impacts that "result[] from the incremental impact of the [proposed] action when added to other past, present, and reasonably foreseeable future actions." 40 C.F.R. §1508.7 (2019).

area, and the post-construction PCSM will make certain there are no stormwater impacts (Id., at

72-73); only a minimal 0.015 acres of wetland will be impacted (Id., at 73); and the Project will

not worsen air quality or result in a substantial noise increase (Id., at 233-34; AR-17, at 3, 10). In

addition, the record demonstrates that the FHWA considered the cumulative impacts of the

Project throughout its development process. See, e.g., AR-49, at 287 (FHWA noting that

circumstances surrounding the project location may merit discussion of cumulative impacts on

the project area); AR-50, at 25 (FHWA requesting an update of cumulative and indirect effects

and for PennDOT to confirm that no new resources in the area would be impacted at an

upcoming coordinating meeting).

In short, the extensive documentation and review of potential impacts contained in the

administrative record demonstrate that Defendants properly considered cumulative effects of the

Project and that the FHWA's approval of a CE for the Project was not arbitrary and capricious.

<b>b.</b>      <b>Individual Impacts Related to Climate Change</b>

Plaintiffs argue that PennDOT failed to properly consider potentially significant impacts

related to greenhouse gas emissions, particularly in light of the Project's design to accommodate

approximately 9,000 more vehicles than are currently on the road (ECF No. 105, at 18). This

argument is largely based on Plaintiffs' application of NEPA's regulation at 40 C.F.R.

§§ 1502.16(b) and 1508.8(b), which, Plaintiffs argue, require agencies to consider a project's

foreseeable indirect impacts, including greenhouse gases that may result as a consequence of the

project. However, Plaintiffs' reliance on these regulations is misplaced, as they only apply in

cases where an EIS is required, which is not the case here. Moreover, as PennDOT correctly

notes, "[t]here is no regulation or federal standard to establish that a lack of greenhouse gas

emissions analysis under NEPA renders an agency decision arbitrary and capricious." (ECF No.

18

108, at p. 27, citing Sierra Club v. Fed. Highway Admin., 715 F.Supp.2d 721, 741 (S.D. Tex. 2010)).[8] Thus, Plaintiffs' argument in this regard is unfounded.

Plaintiffs also argue that FHWA's approval of the CE was arbitrary and capricious because PennDOT failed to discuss the risks of increased flooding and extreme weather events due to climate change, particularly with regard to the two lowered through-lanes beneath State Street envisioned by the Project (ECF No. 105, at p. 18). However, PennDOT determined that the Project is located entirely outside the 100-year floodplain and noted as much in the CEE (AR-19, at 75). Based on this determination, it was reasonable to conclude that increased flooding resulting from climate change will not pose a significant risk to the Project area.

### c.      Environmental Justice Impacts

Executive Order 12898 ("E.O. 12898") instructs federal agencies to consider designs or alternatives that will avoid or minimize "disproportionately high and adverse" impacts on low-income communities or communities of color ("EJ communities").[9] Exec. Order No. 12898, 59 Fed. Reg. 7,629 (Feb 11, 1994); Dept. of Transportation Updated Environmental Justice Order 5610.2(a), Environmental Justice (2012); 77 Fed. Reg. 27,534-02 (May 10, 2012). This Executive Order (E.O. 12898) does not create a private right of action, but an agency's consideration of environmental justice issues may be reviewed under the APA's arbitrary and capricious standard. Coliseum Square Ass'n v. Jackson, 465 F.3d 215, 232 (5th Cir. 2006).

---

[8]
It is also worth noting that, under PennDOT's internal guidance provided by its Project Level Air Quality Handbook, the Project is exempt from greenhouse gas emissions analysis because it qualified as a CE and is, thus, exempt from Regional Emissions Analysis under 40 C.F.R. § 93.127 (AR-38, at 45-46).

[9]
According to the EPA's environmental justice screening and mapping tool, EJSCREEN, the Project area abuts neighborhoods that have been identified as EJ communities, consisting of a high percentage of low-income residents (75%), 54% non-white residents, and "some level of non-English speaking or limited English speaking" residents" (AR-19, at 29, 342).

Importantly, NEPA does not require the FHWA to select an alternative with the least environmental justice impact. Latin Americans for Soc. And Econ. Dev. V. Fed. Highway Admin., 756 F.3d 447, 476 (6th Cir. 2014). In addition, while environmental justice issues are a consideration in an agency's decision-making, they are not controlling. Id. at 477. Nonetheless, courts may overturn a NEPA approval where a "bare-bones" environmental justice analysis, concluding the community would not be disproportionately harmed, violates NEPA's "hard look" requirement. Standing Rock Sioux Tribe v. U.S. Army Corps. of Eng'rs, 255 F.Supp.3d 101, 140 (D.D.C. 2017).

Here, Plaintiffs contend that PennDOT failed to take a hard look at the Project's environmental justice impacts. (ECF No. 105, at p. 19). In particular, Plaintiffs assert that Defendants failed to consider the possibility of increased air pollution, noise, and traffic speed, as well as whether the Project will benefit the EJ communities. (Id., at pp. 20-24). Each of these points of contention will be addressed in turn.

### i.      Increased Air Pollution from More Traffic

Plaintiffs contend that PennDOT improperly "assumed the Project would reduce air pollution without actually assessing whether increased vehicle traffic on the Bayfront Parkway would affect local air quality in the [EJ] community." (ECF No. 105, at p. 21). The record indicates otherwise.

As reflected in the CEE, the Project is included in the Air Quality Conformity Determination Report, as a part of Pennsylvania's Transportation Improvement Program and Long Range Transportation Plan (AR-19, at 233; AR-5). The report documents that detailed assessments were performed for new projects that may have a significant effect on emissions, which included projects that would increase capacity or significantly impact vehicular speeds

(AR-19, at 223; AR-5, at 21). The Bayfront Parkway Project was included among the projects in the report, and the Project area was determined to be in conformity with Pennsylvania's applicable State Implementation Plan and EPA requirements (AR-19, at 233; AR-5, at 28). In addition, it was determined that the Project will not worsen air quality or negatively affect implementation of National Ambient Air Quality Standards (AR-19, at 233; AR-17, at 3, 10). Finally, PennDOT's analysis indicated that the proposed intersection modifications would provide for more efficient traffic movement with less stops, thereby reducing congestion and potential air pollutants (AR-19, at 342-43; AR-14, at 10-14; AR-26, at 47, 51).

Thus, the record supports PennDOT's determination that the Project will not have significant impacts on air quality, and the FHWA's approval of a CE in light of this determination was not arbitrary and capricious.

### ii.    Increased Noise

Plaintiffs argue that "PennDOT's noise analysis was insufficient because it dd not reflect current or projected traffic levels." (ECF No. 105, at p. 21). In particular, Plaintiffs contend that PennDOT's noise analysis was based on inaccurate Average Daily Traffic ("ADT") volumes contained in a chart in Appendix 2 of the Preliminary Design Traffic Noise Report ("Noise Report") (AR-12). According to this chart, the ADT in 2018 is recorded as 19,039 vehicles, while the projected ADT in 2040 is recorded as 19,700 (AR-12, at 70), a projected increase of only 661 vehicles per day. In contrast, Plaintiffs note that the CE reflects 2020 ADT of 16,793 vehicles and 2040 ADT of 25,700 vehicles (AR-19, at 44), a projected increase of nearly 9,000 vehicles per day. In light of this significant discrepancy, Plaintiffs contend that PennDOT's erroneous noise analysis cannot support its conclusion that "the project has no traffic noise impacts" that will affect the EJ community (AR-19, at 343).

Defendants counter that Plaintiffs' contention is misguided because the Noise Report's analysis was based on peak hour traffic volumes, rather than ADT. This is made clear in the Noise Report, which explains, "Because the highest design year traffic volumes are associated with the PM peak-hour, *PM peak-hour traffic volumes were used throughout this study including the existing and predicted future traffic on Bayfront Parkway and other roadways*." (AR-12, at 10) (emphasis added). Importantly, PennDOT notes that existing and projected peak hour traffic volumes were based on the data shown in the intersection diagrams in Appendix 2 of the Noise Report (AR-12, at 68-69), rather than the erroneous ADT chart referenced by Plaintiffs (AR-12, at 70). (ECF No. 113, at p. 5, n.3; AR-12, at 8). Moreover, contrary to Plaintiffs' reply arguing that the peak-hour traffic calculations in the Noise Report are based on the erroneous ADT values (ECF No. 119, at p. 13), the record indicates that the peak-hour traffic values were actually based on manual traffic counts during peak hours, rather than ADT (AR-14, at 9, 27-28).

Based on the foregoing, it is apparent that PennDOT's noise analysis was appropriately derived from relevant traffic volume data contained in the record, which adequately supports PennDOT's conclusion that "the project has no traffic noise impacts" that will affect the EJ community.

### iii.    Increased Traffic Speed

Plaintiffs argue that PennDOT failed to consider potential negative impacts of selecting an overall design speed for the Project that is faster than the "required value" for the type of roadway considered. (ECF No. 105, at p. 21). In making this argument, Plaintiffs point to the Project's Design Criteria Matrix (ECF No. 73-1, at p. 25), highlighting the fact that the Project's proposed design speed of 35 mph is "5 miles faster than the maximum allowed design speed,"

which Plaintiffs construe as the "required value" of 25-30 mph noted in the Matrix. (ECF No. 105, at p. 21). This argument is misguided.

The record includes PennDOT's Design Manual Part 1X, Appendix P, which states, "The design speed for a project shall be equal to or greater than the proposed posted regulatory or regulatory unposted speed limit of the roadway" (AR-33, at 293). The Bayfront Parkway has an existing design speed of 40 mph and an existing posted speed limit of 35 mph. (ECF 73-1, at 25; AR-19, at 17). Thus, by selecting a design speed for the Project of 35 mph, which is equal to the existing posted speed limit and is five miles per hour less than the existing design speed for the Parkway, PennDOT has complied with its Design Manual and, more importantly, alleviated any potential negative impacts to the surrounding EJ community resulting from traffic speed.

### iv.    Pedestrian, Bicycle, and Transit Impacts

Plaintiffs argue that PennDOT could not "reasonably have determined that the Project would improve bicycle and pedestrian access" because it did not fully complete a Bicycle and Pedestrian Checklist for the Project until August 4, 2021, more than a year after the FHWA approved the Project as a CE. (ECF No. 105, at p. 22). Nonetheless, the CEE makes clear that one of the Project's purposes is to improve pedestrian, bicycle, transit and passenger vehicle connection, which will be accomplished through the construction of pedestrian bridges, the completion of a fully connected multi-use trail, and the addition of new sidewalks and crosswalks across the Parkway  (AR-19, at 7-8, 123, 168-69, 200, 341). Indeed, one cannot read the CEE, in its entirety, without noticing the Project's emphasis on increasing pedestrian and bicycle access.

Plaintiffs argue further that the record's "conflicting and inconsistent information about how many pedestrian bridges will actually be built" further reflects PennDOT's lack of analysis

regarding the Project's impacts on pedestrians, bicyclists, and transit riders. (ECF No. 105, at p. 22). In particular, Plaintiffs' note that both PennDOT's Traffic Analysis Report (AR-14, at 7, 26) and the Roadway Section of the CEE (AR-19, at 55-57) mention only one pedestrian bridge for the Holland Street intersection, while a letter from Thomas McClellan, P.E., of PennDOT to Jonathan Crum of the FHWA, dated March 27, 2020, states that pedestrian bridges at all three intersections are part of the Project, but that the bridge at the State Street intersection may not be needed because of better pedestrian connection, and the bridge at the Sassafras Street intersection depends on private development (AR-50, at 240). Regardless of what took place before, however, the CEE ultimately approved by the FHWA expressly includes three pedestrian bridges, one at each intersection (AR-19, at 7, 11-13).

In view of all the foregoing, Plaintiffs' assertion that PennDOT merely performed a "bare-bones" environmental justice analysis is belied by the record. Despite all of Plaintiffs' environmental justice concerns, the ultimate question of whether PennDOT appropriately considered designs or alternatives that will avoid or minimize "disproportionately high and adverse" impacts on EJ communities must be answered in the affirmative.

## 5. Substantial Controversy on Environmental Grounds

FHWA regulations provide that in "unusual circumstances," a project which typically qualifies as a CE may require additional study to determine whether a CE is proper. 23 C.F.R. 771.117(b). "[U]nusual circumstances" include "[s]ubstantial controversy on environmental grounds." 23 C.F.R. § 771.117(b)(2). Here, Plaintiffs argue that the record reveals substantial controversy on environmental grounds which should have caused the FHWA to conduct further environmental studies to determine whether a CE for the Project is warranted. Instead, the FHWA agreed with PennDOT's finding that there was no substantial controversy on

environmental grounds and approved the Project as a CE. For this reason, Plaintiffs claim the FHWA's approval was arbitrary and capricious  (ECF No. 105, at pp. 24-25).

In support of this argument, Plaintiffs point to public comments in the record expressing opposition to the Project, including PennFuture's own letter of June 4, 2020. According to Plaintiffs, the public comments at issue "express[ed] concern about safety, induced vehicle traffic, pedestrian and bicycle access, congestion, smells, noise, and aesthetic impacts." (Id., at 24; AR-21, at 131-167; AR-23, at 5-6). In particular, Plaintiffs note that PennDOT received public concerns that the "EJ populations will … be exposed to increased environmental hazards" and that "there will be increased traffic which will cause air and noise pollution, amongst other impacts to the community" (AR-52, at 516). In addition, in its letter of June 4, 2020, PennFuture specifically objected to PennDOT's finding that the Project had "no substantial controversy," stating that "community members anticipated a chance to weigh in on the potential environmental impacts of the project at the appropriate time." (AR-52, at 508). Defendants counter that the comments cited by Plaintiffs do not establish the presence of a "substantial controversy on environmental grounds." (ECF No. 113, at p. 10; ECF No. 115, at p. 15).

Courts have generally understood that opposition to a project does not necessarily mean a substantial controversy. As one court explained,

> The mere existence of opposition does not trigger the [agency's] duty to prepare an environmental review." West Houston Air Committee v. FAA, 784 F.2d 702, 705 (5th Cir. 1986). Courts "long ago rejected the suggestion that 'controversial' must necessarily be equated with opposition." North Carolina v. FAA, 957 F.2d 1125, 1133–34 (4th Cir. 1992). Otherwise, "opposition, and not the reasoned analysis set forth in the environmental assessment, would determine whether a[ ] [CE] would have to be prepared." Id. Thus, "the outcome would be governed by a 'heckler's veto.'" North Carolina, 957 F.2d at 1134 (quoting River Road Alliance, Inc. v. Corps of Eng'rs of United States Army, 764 F.2d 445, 451 (7th Cir. 1985)); see also Friends of Richards-Gebaur Airport v. FAA, 251 F.3d 1178, 1187 (8th Cir. 2001) (upholding CE based in part on "determination that 65 letters

opposing the project [most of which did not voice environmental concerns] did
not constitute a substantial controversy on environmental grounds")

Aquifer Guardians in Urban Areas v. Fed. Highway Admin., 779 F. Supp. 2d 542, 572 (W.D.

Tex. 2011).

A project is substantially controversial where "a substantial dispute exists as to the size,

nature, or effect of the major federal action rather than to the existence of opposition to a use."

Friends of the Ompompanoosuc v. F.E.R.C., 968 F.2d 1549, 1557 (2d Cir. 1992). In addition, it

has been found that "'a substantial dispute exists where the agency received numerous responses

from conservationists, biologists, and other knowledgeable individuals, all highly critical of

the ... [agency's determinations and conclusions].'" Hells Canyon Preservation Council v.

Jacoby, 9 F.Supp.2d 1216, 1242 (D. Or. 1998), quoting Greenpeace Action v. Franklin, 14 F.3d.

1324, 1334 (9th Cir. 1992). (internal citation and quotations omitted).

Here, the majority of public comments to which Plaintiffs refer were submitted

"throughout 2018 and 2019," well before the CEE was prepared (ECF No. 105, at p. 24; AR-21,

at 131-167). Predictably, none of these comments raises any environmental concern. As a result,

any of these comments offering negative feedback on the Project merely fall into the category of

opposition and fail to support Plaintiffs' claim of substantial controversy under NEPA

regulations.

The remaining comments of record consist of online comments that were submitted on

the Project's website in response to PennDOT's press release announcing its preferred alternative

for the Project (AR-51, at 324). Of the thirty comments found in the record (AR-24, at 58-61),

only six raise any concerns regarding the lack of an environmental assessment, five of which

merely express general concerns without citing any factual or scientific basis for those concerns

(Id., at 60-61, comments dated 5/14/20, 5/18/20, 6/5/20, 6/10/20, and 6/11/20). The only

comment raising specific environmental concerns was written by one of the Plaintiffs, PennFuture, on June 4, 2020 (Id., at 61), the same date PennFuture wrote its letter to PennDOT expressing the same concerns (AR-52, at 507-509). However, "in cases where 'virtual agreement exists among local, state, and federal government officials, private parties, and local environmentalists, criticisms of the plaintiff and its experts are not sufficient to demonstrate the existence of a public controversy.'" Hells Canyon, 9 F.Supp.2d at 1242, quoting Greenpeace, 14 F.3d at 1334 (internal citation omitted)

Because the record fails to establish the existence of a substantial controversy on environmental grounds, the FHWA's approval of the Project as a CE without conducting any further environmental studies was not arbitrary and capricious.

### B.    Propriety of "Downscoping" Project from EA to CE

Plaintiffs next argue that the FHWA's approval of a CE for the Project was arbitrary and capricious because the CE was based on an improper "downscoping" from an EA. (ECF No. 105, at pp 25-27). According to Plaintiffs, "[t]here are no federal regulations, guidance documents, or reported NEPA cases using the term "downscoping" to refer to the act or decision to reduce a NEPA process from an [EA] to a [CE]." (Id. at p. 26). Conversely, the FHWA argues that "Plaintiffs have failed to cite any regulation or guidance that prevents an agency from reassessing the level of NEPA review applied to a proposed action." (ECF No. 115, at p. 17). Instead, Plaintiff points to FHWA guidance that states, "[EAs] are appropriate when the significance of an environmental impact is unknown. EAs result in either a Finding of No Significant Impact ("FONSI"), or the determination that the preparation of an EIS is required." (Id. at p. 27). Yet, an agency's internal guidance document is not binding legal authority governing the agency's actions. See Hayes v. Harvey, 903 F.3d 32, 46 (3d Cir. 2018) (internal

guidance documents "lack the force of law" and "do not warrant deference," although they are entitled to "a degree of 'respect'") (citations omitted).

In the absence of statutory or regulatory authority restricting the FHWA's ability to reduce, or "downscope," its level of review from an EA to a CE after it determined that the Project would not "individually or cumulatively have a significant effect on the human environment" in accordance with 40 C.F.R. § 1508.4 (2019), the Court is unable to conclude that the FHWA's "downscoping" of the Project from an EA to a CE was arbitrary and capricious.[10]

### C.    Public Hearing Under Federal-Aid Highway Act

Under the Federal-Aid Highway Act, a state transportation agency seeking federal funding for a "federal aid highway project" that goes through a city must: (1) certify that a public transcript to the U.S. Department of Transportation. 23 U.S.C. § 128(a). Because the Project is federally funded and goes through the City of Erie, it constitutes a "federal-aid highway project."

The FHWA's regulations implementing Section 128(a) are found at 23 C.F.R. § 771.111(h), and require each state to "have procedures approved by FHWA to carry out a public involvement/public hearing program pursuant to 23 U.S.C. § 128 & § 139 and CEQ regulations." 23 C.F.R. § 771.111(h)(1). With regard to public hearings, FHWA's regulations require the state procedures to provide for:

> One or more public hearings or the opportunity for hearing(s) to be held by the State highway agency at a convenient time and place for any Federal-aid project that requires significant amounts of right-of-way, substantially changes the layout or functions of connecting roadways or of the facility being improved, has a substantial adverse impact on abutting property, otherwise has a significant social, economic, environmental or

---

10

Because the Court has rejected Plaintiffs' arguments that the Project failed to meet the requirements for a CE and that the "downscoping" of the Project from an EA to a CE is not allowed under NEPA, Plaintiffs' argument that PennDOT should have finalized its environmental assessment in accordance with 23 C.F.R. 771.119(a)(1) is moot and will not be discussed herein. (ECF No. 105, at pp. 27-32).

> other effect, or for which the FHWA determines that a public hearing is in
> the public interest ….

23 C.F.R. § 771.111(h)(2)(iii).

Here, Plaintiffs contend that the Project required a public hearing because it
"substantially changes the layout … of connecting roadways." (ECF No. 105, at p. 33).
However, the Project's major modifications to the roadway primarily affect the layout of the
Bayfront Parkway itself (construction of roundabouts and lowering the roadway beneath State
Street with at-grade ramps), with few changes in the layout of the connecting roadways (AR-19,
at 12-14, 54-57). Thus, Plaintiffs' application of the foregoing regulation's requirement for a
public hearing is misplaced.

Indeed, while the  FHWA's regulations provide specific public hearing requirements for
EISs, 23 C.F.R. 771.123(j), and EAs, 23 C.F.R. 771.119(f), there is no such requirement for CEs,
23 C.F.R. 771.117. This fact has been confirmed by a number of courts that have considered the
issue. See, e.g., Clement v. LaHood, 2010 WL 1779701, at *13 (E.D. Va. Apr. 30, 2010), aff'd,
397 Fed. Appx. 859 (4th Cir. 2010) (*per curiam*) ("By definition, CEs cause no significant
impact, so no public hearing was required"); Kyle v. Brown, 2007 WL 9706831, at *9 (W.D.
Tex. July 17, 2007), citing Douglas v. State of Nevada, 1990  WL 95418, at *2 (9th Cir. July 11,
1990) ("designation as a [CE] exempts a project from public hearing requirements"); Galloway
v. Arkansas State Highway and Trans. Dep't, 885 S.W.2d 17, 19-20 (Ark. 1994) (same).[11]

---

[11]
In Plaintiffs' brief opposing Defendants' motion for summary judgment [ECF No. 111], Plaintiffs cite the case of
City of Davis v. Coleman, 521 F.2d 661 (9th Cir. 1975) in support of their assertion that 23 U.S.C. 128(a) still
required PennDOT to hold a public hearing despite the Project's qualification as a CE (Id. at p. 35). As PennDOT
notes in its reply brief, however, City of Davis was decided before either the CEQ or FHWA promulgated their
regulations on CEs (ECF No. 120, at p. 13). Thus, the case is inapposite.

Therefore, PennDOT complied with 23 C.F.R. § 771.111(h) and had no legal obligation to hold or provide the opportunity to request a public hearing for the Project under the Federal-Aid Highway Act.

## III.   CONCLUSION

Based on the foregoing, Plaintiffs have failed to demonstrate that the FHWA's approval of a CE for the Bayfront Parkway Project was arbitrary and capricious. To the contrary, the Court has determined that the administrative record supports the conclusion that Defendants took a "hard look" at the Project's environmental consequences in accordance with NEPA's procedural requirements. In addition, the Court finds that PennDOT was not legally obligated by the Federal-Aid Highway Act to hold or provide the opportunity to request a public hearing on the Project, in light of its qualification as a CE. For these reasons, Plaintiff's motion for summary judgment will be denied and Defendants' motions for summary judgment will be granted.

An appropriate Order follows.